Joe Dale JOHNSON, Appellant,

v.

The STATE of Texas.

NO. PD–1496–14

Court of Criminal Appeals of Texas.

DELIVERED: May 25, 2016

Todd Greenwood, Jeffrey Lewis Eaves, Wichita Falls, for Appellant.

Lisa McMinn, State's Attorney, Austin, Carey Jensen, John Gillespie, Assistant District Attorneys, Wichita Falls, for the State of Texas.

*OPINION*

Richardson, J., delivered the opinion of the Court in which Meyers, Johnson, Alcala, and Yeary, JJ., joined.

Appellant, Joe Dale·Johnson, was convicted of two counts of aggravated sexual

assault of a child and sentenced to life imprisonment on each count. On direct appeal, Johnson claimed that the trial court erred in excluding evidence of the victim's past sexual behavior. Johnson argued that this evidence was relevant to his defense of fabrication, that excluding this evidence violated his right of confrontation,[1] and that it was admissible under the Texas Rules of Evidence.[2] The Second Court of Appeals held that the trial court did not abuse its discretion in excluding such evidence and affirmed Johnson's conviction. We hold that the proffered cross-examination by Johnson's counsel should have been permitted. We reverse the decision of the court of appeals and remand the case to that court for a harm analysis under Texas Rule of Appellate Procedure 44.2(a).

*FACTUAL BACKGROUND*

Appellant, Joe Dale Johnson, was a board member at the church where the victim, H.H., and his family attended. Johnson also ran the sound board and the projector in the church sanctuary and helped with the youth group. Some time in late 2006, when H.H. was twelve, Johnson started spending time with H.H. Over the next few months, Johnson had H.H. to his house, took H.H. to movies, hockey games, and out to eat.

Just after H.H.'s thirteenth birthday, in late May or early June of 2007, Johnson asked H.H. to mow his lawn. He and H.H. were alone together at Johnson's house. According to H.H.'s version of events, the two of them were sitting on Johnson's couch, and Johnson reached

1. *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim.App.2009) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)) ("The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying.").

2. TEX. R. EVID. 412(b)(2)(C), (E).

over and started touching H.H.'s stomach. Johnson then asked to see H.H.'s penis. H.H. complied because he felt indebted to Johnson for all the time Johnson spent with him taking him to movies and hockey games. H.H. said that Johnson then showed him "some pornography that he had downloaded to his computer." H.H. admitted this was not the first time he had seen pornography. Johnson persuaded H.H. to allow Johnson to perform oral sex on H.H. Johnson instructed H.H. to reciprocate, which H.H. did "for five seconds" but stopped "because [H.H.] didn't like it." After this happened, H.H. and Johnson finished mowing Johnson's lawn. Johnson paid H.H. $50 and took him to Walmart, where H.H. said that he spent the money that Johnson gave him "for mowing his lawn and doing the sexual [acts]." Afterwards, Johnson took H.H. to eat at Hunan's restaurant.

In the fall of 2007, Johnson gave H.H. a Nintendo DS gaming system and told him "that if anyone asked, it was donated to the church." However, the teen group leader, "Jimmy," told H.H. that he didn't want the teen group to have the Nintendo DS because it would cause conflict in the church between the teen group and the younger kids. The pastor of the church took the Nintendo DS, and H.H. testified that he was upset because he did not get the Nintendo DS that Johnson had promised him.

A note that H.H. wrote to Johnson, but never delivered, was admitted into evidence. The note stated,

> You want to know your benefits? They are as follows: Secret keeper, lying to my parents and my friendship. So if you don't want to give it to me, don't. I don't care.

H.H. said that he wrote the note because, at the time that he asked Johnson for the Nintendo DS, Johnson asked H.H. what was H.H. going to give Johnson (thus, the reference to "your benefits"). H.H. said that he wasn't going to do anything else to, or for, Johnson, so H.H. wrote Johnson the note to clarify Johnson's "benefits." H.H. testified that he "was pretty angry because [Johnson] wanted [H.H.] to do more stuff for him." Some time just after the incident with the Nintendo DS, H.H.'s parents told him that he shouldn't see Johnson anymore because they were afraid that something was happening.

In November of 2007, H.H. decided to tell Jimmy, the teen group leader, about the sexual assault. According to H.H.'s testimony,

> [A]fter the DS wasn't allowed to come to the teen group, I was at first pretty angry that I didn't get the DS like I wanted, but then I got to thinking about it and then I thanked Jimmy for not letting us have it. That was the teen leader that didn't allow it to come through. And I told him that I was thankful for it and he said that—why are you glad that that didn't happen? I said, well, let's just say I can't tell you. And he said, well, that sounds a lot like something that happened to me.

H.H. said that after he told Jimmy he "felt better, like a weight off [his] shoulders." Jimmy then told H.H.'s parents about the outcry, and H.H.'s parents reported it to the police.[3] Johnson was arrested on December 6, 2007.

## PROCEDURAL BACKGROUND

### A. Before Trial

During a pretrial hearing in October of

---

**3.** Jimmy did not testify at Johnson's trial because he was in the Army and was stationed in Italy.

2009,[4] Johnson's defense counsel announced to the trial judge that the State had just disclosed to the defense that "the alleged victim ... has been adjudicated for some sort of sexual offense. And this was the first we've heard of it." Johnson's counsel argued that this was *Brady* evidence and that he wanted to be able to impeach the victim with it. The State responded, in part, that juvenile adjudications were not admissible for impeachment. The prosecutor represented that it wasn't until "months" after the date of this offense that H.H. was caught and placed in the juvenile system on a juvenile felony sexual adjudication. At that pretrial hearing, the juvenile file was sealed, and no one appeared to know the details of the sexual offense charges that had been brought against H.H.

When Johnson's counsel asked the prosecutor if the acts, for which H.H. was ultimately adjudicated, occurred before or after the outcry against Johnson, the prosecutor replied that "some of those occurred ... before the accusation came out against Mr. Johnson." Johnson's defense counsel insisted that, if the victim "did those certain acts prior to this, then he knows those acts are wrong and then he can make false allegations against Mr. Johnson." Although it is not clear when the prosecutors learned of the sexual assault allegation against H.H., there is nothing in the record suggesting that the State had knowledge of it when H.H. made his outcry or when Johnson was arrested in this case. In fact, it appears that the State's awareness and involvement in the

sexual abuse case against H.H. was sandwiched in between the outcry and the trial in this case. H.H.'s status as an alleged juvenile sex offender appears to have arisen *after* Johnson was arrested (December 6, 2007), and was concluded *before* Johnson was tried (June 13, 2011). Because the records from the juvenile offense were sealed, the trial court granted Johnson's motion for a continuance so that, once the juvenile records were unsealed, the parties could review them.

Almost two years later, on June 9, 2011, the parties reconvened before the trial court for another pretrial hearing. The parties and the trial court had reviewed the victim's juvenile record, which reflected that, in May of 2008, H.H. was charged with sexually assaulting his younger sister some time in April of 2008.[5] On July 18, 2008, the juvenile court "defer[red] its decision on registration requirement until juvenile has completed an approved sex offender treatment as a condition of probation or commitment to the Texas Youth Commission." In July of 2010, H.H.'s probation was discharged. Johnson's counsel requested that he be allowed to impeach H.H. with evidence of H.H.'s juvenile adjudication. In response, the State argued that there were "no more strings attached" to H.H., and that nothing was being "held over" H.H. at that time. The State's argument is consistent with the time line of events:

> Summer 2007   Sexual contact allegedly occurred between Johnson & H.H.
>
> November 2007   H.H. made outcry

---

4. The clerk's record contains a motion filed by the State to transfer the case to a new cause number. According to that motion, Johnson was indicted on September 9, 2009, and again on October 7, 2009 under a different cause number.

5. This charge, that H.H.'s juvenile offense occurred in April of 2008, contradicts H.H.'s testimony proffered on cross-examination held outside the presence of the jury. Defense counsel asked H.H. if, after H.H. made the accusation against Johnson in November of 2007, he continued to abuse his sister, and H.H. answered "No."

December 2007 Johnson arrested and charged with this offense

May 2008 H.H. charged as a juvenile with sexually assaulting his sister in April of 2008

July 2008 H.H. placed on juvenile probation in his case

October 2009 Pretrial hearing in Johnson's case where State disclosed H.H.'s juvenile sexual offense

July 2010 H.H.'s juvenile probation discharged

June 2011 Trial began in Johnson's case

The trial court judge decided that the outcry in this case, which was in November of 2007, "was made well before the allegation of charges against the juvenile in a totally unrelated matter." He ruled that he would not allow the defense to get into those matters because he determined that they were not relevant to this case. The trial court judge also stated that, "by law a juvenile cannot give consent to any sexual activity. So with that being the case, then as it stands now, I'm not—I'm not going to allow the parties to get into sex acts unrelated to those with Mr. Johnson." [6]

There was nothing contained in the pretrial record in this case, in the context of H.H.'s juvenile case, suggesting that H.H. had been sexually abusing his sister for a number of years. That information did not come to light until the trial when H.H. testified outside the jury's presence.

### B. *The Trial*

#### 1. *What the jury did and did not hear from H.H.'s father*

Trial began June 14, 2011. H.H.'s father was the State's first witness. H.H.'s father provided much of the factual background noted above regarding how H.H. and Johnson met.

Defense counsel asked the trial judge if he could question H.H.'s father about H.H.'s emotional state during the fall of 2007. The trial judge excused the jury so that he could evaluate whether the evidence that Johnson's counsel sought to elicit from H.H.'s father was admissible. Outside of the jury's presence, when questioned by Johnson's counsel, H.H.'s father testified as follows:

Q. ... [I]n the fall of 2007 before [H.H.] allegedly made this outcry of sexual abuse, had he been arrested for shoplifting?

A. No.

Q. Had he—when was he arrested for shoplifting from Wal–Mart?

A. He wasn't arrested.

Q. Was he ever accused of it?

A. Yes.

Q. Was he accused of it in the fall of 2007?

A. I believe so.

Q. How many times was he accused of it in the fall of 2007?

---

**6.** It appears that the State had no knowledge of H.H.'s sexual abuse of his sister at the time that Johnson was charged in this case. But, as we have noted, the State also claimed that it had no knowledge of any details of H.H.'s juvenile case when the parties met for the pretrial hearing. The appellate court, in its *en banc* opinion, reiterated that, "At the time of the pretrial hearing, the State did not have any specific information regarding H.H.'s juvenile adjudication but knew that it was a sexual offense and that the adjudication occurred 'months or almost a year' after H.H.'s outcry against Johnson." Although the District Attorney's office in Wichita County handles juvenile offenses, and thus, in 2009, the prosecutors in that office should have had access to and control over all of the information related to H.H.'s juvenile case, we will assume that the individual prosecutors handling Johnson's case were not aware of the information related to H.H.'s juvenile case.

A. Just once that I remember.

Q. Okay. And was that around the time of the outcry?

A. I don't remember the exact date, but it could be possible.

Q. Did he get in trouble for the shoplifting incident from either you or your wife?

A. I'm sure.

Q. What did y'all do to him?

A. I probably beat him, spanked him.

Q. And when you say—when you say you beat him, you did what?

A. I spanked him.

Q. Okay. And what else happened to him, anything?

A. As far as I know, no.

Q. Was he getting in trouble in school in the fall of 2007?

A. I know he had been bullied a little.

Q. Okay. But he wasn't getting in any trouble from the teachers or anything like that?

A. Not that I'm aware of.

Q. Was he having relationship problems with your wife?

A. Yes.

Q. What kind of problems?

A. He would say things that was [*sic*] hurtful to my wife.

Q. Such as?

A. Well, the—the thing that comes to mind was we were in the car once and my wife said she was doing the best that she could as a mother and my son snickered and it upset her pretty good.

\* \* \*

Q. How bad was the relationship between your wife and [H.H.] in the fall of 2007?

A. I mean, they might have not spoken to each other, but I don't—wouldn't know to say anything else than that.

Q. Now, was your son undergoing any type of counseling or therapy in the fall of 2007?

A. Yes.

Q. Where at?

A. Christ Home Place.

Q. And what was it for?

A. Just dealing with things.

Q. What things?

A. School I believe he was depressed somewhat.

Q. What else?

A. And the—I believe the pornography thing came—thing came up.

Q. Okay. Was he being treated because of sexual abuse to his sister?

A. No.

Q. What was he depressed about?

A. I have no idea, just everyday teenager stuff, I guess.

Q. What problems was he dealing with at school that he had to go to Christ Home Place Ministries?

A. Kids were bullying him. They would—I know on one instance, some kid came up behind him and ripped his new hoodie.

Q. Okay. Would it be fair to say that his emotional state in November of 2007 was not good?

A. He was probably dealing—he was dealing with some stuff.

Q. Okay. Would you—so his—he was depressed, he was having relationship problems with his mother, he was getting counseling, he was being bullied at school. You would agree with me, he—he was having emotional difficulties in November of 2007 when he made this outcry?

A. I guess that would be plausible to say.

Q. In November—in the fall of 2007, had you caught him having any kind of sexual contact with his sister?

A. When?

Q. The fall of 2007?

A. No. I'm sorry, let me take that back. No. It was not May—not fall of 2007.

Even though not readily apparent from H.H.'s father's response to this last question, after our thorough review of the record, it is clear to this Court that H.H.'s father had discovered that H.H. was having sexual contact with his sister some time around May of 2007. This is consistent with H.H.'s testimony, quoted below, that H.H.'s parents had put him in counseling some time before November of 2007 because they had "guessed" that H.H. was sexually abusing his sister, and "they wanted it to stop."

In response to defense counsel's request that the court allow him to ask H.H.'s father these questions, the State argued,

With regard to [H.H.] being in counseling and, you know, the depression and problems at school, pornography, those sorts of things, we think, you know, defense could—could ask [H.H.] about those and cross-examine him. Specifically, the—the, you know, any mention of sexual assault, I think we've already dealt with that pretrial and then Rule 609 in the Rules of Evidence as well as the Family Code prohibit impeachment by a juvenile adjudication. But you know, his going through counseling and the—the emotional problems at that time, that may be okay.

The court ruled that it would allow the defense counsel to cross examine H.H.'s father in the presence of the jury on the topics of counseling and the emotional problems, but he could not ask any questions related to H.H. having sexually abused his younger sister.

When the jury returned to the courtroom, defense counsel questioned H.H.'s father about the "emotional difficulties" H.H. was having. The jury heard H.H.'s father testify that H.H. was in counseling at Christ Home Place Center because of "depression" caused by "some [bullying] issues at school," for the "pornography issue," because H.H.'s relationship with his mother was "strained," and because H.H. had gotten caught shoplifting at the Walmart. H.H.'s father testified that H.H.'s depression was moderate, not severe, and that he would "cry a little" from it. When questioned on re-direct by the prosecutor, H.H.'s father clarified that he and his wife had placed H.H. in counseling for these issues, which H.H.'s father did not consider "outside the realm" of normal teenager conflict.

### 2. *What the jury did and did not hear from H.H.*

H.H. was the next to testify. On cross-examination by Johnson's counsel, H.H. confirmed that he had been watching pornography since the age of ten. H.H. testified that he entered into voluntary counseling after the incident with Johnson in the summer of 2007, and it continued until April 2008. H.H. admitted that, when he did not get the Nintendo DS from Johnson, H.H. knew he "could make an accusation of sexual abuse and get somebody in trouble."

During defense counsel's cross examination of H.H., the jury was excused, and defense counsel was permitted to question H.H. about his sexual abuse of his sister:

Q. You had been sexually abusing your sister for a number of years, had you not?

A. Yes.

Q. Did you tell them every time that you did that?

A. Who?

Q. Your parents?

A. Yes. They knew.

Q. Every time?

A. Yes. I went through treatment, so they had to know.

Q. Well, I'm talking about in the fall of 2007.

A. Back then? No, they did not know.

Q. Okay. And did you have—I'm trying to—did you—did you feel guilt over that?

A. Yes.

Q. In the fall of 2007?

A. Minute guilt, yes.

Q. Minute.

A. Yes.

Q. I'm trying to figure out how you will feel this emotion is lifted off of you when somebody allegedly did something to you, but you feel minute guilt over your sister?

A. Was that a question?

Q. Yes.

A. I don't know.

Q. Okay. You—you're not a—sex addict, whether it be through watching pornography or abusing your sister or what you claim to have happened with Joe, they didn't make you feel guilt at all, did they?

A. Yes, they did.

Q. You didn't feel guilty with what you did with Joe, did you? What you claim you did with Joe?

A. Yes, I did.

Q. All right. And after you released this information and were relieved and felt better about it, you continued to abuse your sister, correct?

A. No.

Q. That was the end of it?

A. It wasn't the end, but they put—my parents put me in counseling for that reason. That's why I was in counseling at that Christ Care thing.

Q. In the—in the fall of 2007?

A. Yes, that's why I was in counseling.

Q. And that was one of the things you were struggling with in November of 2007?

A. Yes.

Q. And that was contributing to your emotional difficulties?

A. A little bit, yes.

While still outside the presence of the jury, on redirect examination by the State, H.H. testified as follows:

Q. ... I want to clear up any confusion. Are you saying that you were struggling with the sexual abuse with Joe during November of 2007 or what was happening at home with your sister?

A. Both.

Q. When you started counseling, your parents didn't know about sexual abuse with Joe or your sister, did they?

A. They did not know about sexual abuse with Joe, but they knew about sexual abuse of my sister. They had guessed what was happening and they wanted it to stop.

Q. Okay.

A. And they were trying to find out through the counselor if I had or not.

The evidence that H.H. had been sexually abusing his sister for a number of years came only from this testimony by H.H. Although at times it was difficult to discern from H.H.'s testimony exactly what his parents knew about the sexual abuse of

his sister and exactly when they found out about it, H.H. clarified that his parents had put him in counseling because they knew about H.H.'s sexual abuse of his sister. And, it was clear that they had put H.H. in counseling some time before November of 2007.

Defense counsel argued that this testimony was relevant to H.H.'s emotional state at the time of the outcry in November of 2007 because it "affect[ed] his perceptions and thoughts;" and it was relevant because it showed "that [H.H.'s] motive for [accusing Johnson] was not only for deception, but to get attention." Johnson's counsel said they were offering this evidence under the Sixth Amendment as well as Rules 404(b) and 412, arguing that it went to H.H.'s credibility as a witness and his motivation for fabrication.[7]

The State objected to the testimony, arguing that H.H.'s 2008 juvenile adjudication for sexual assault was not relevant to Johnson's fabrication theory and was inadmissible under Rule 609. The court sustained the State's objection and did not allow defense counsel to question H.H. about being placed in counseling by his parents for sexually abusing his sister. The trial court judge did allow Johnson to inquire into the shoplifting accusation.

H.H. admitted that he had been caught shoplifting "close to the time" he accused Johnson.

### 3. *Johnson's Extraneous Offense*

Before resting its case, the State asked to call "G.M." as a witness. G.M. was a 44–year–old man who, according to the State, could testify that he was molested by Johnson "under almost mirror like circumstance[s] in 1979." The State argued that Johnson had opened the door to this extraneous offense evidence by claiming the defenses of fabrication, frame up, and retaliation. Over Johnson's objections, the trial court concluded that G.M.'s testimony would be relevant to rebut the defensive theory of fabrication and that it would not be unduly prejudicial: "The defense of fabrication has come through loud and clear from the time of the voir dire of the Jury on up and through the examination of the last witness. So I'm going to allow it in." G.M. testified that, when he was thirteen, he met Johnson through another friend named "Mike." Johnson would take G.M. and Mike swimming. On one occasion, Johnson grabbed G.M.'s "private area." G.M. testified that, when they were alone, Johnson promised G.M. a motorcycle if he would put his penis in Johnson's mouth

---

**7.** The specific argument made by Johnson's counsel at trial was,

> Judge, we'd just like to offer all of that testimony to—that goes to his emotional state in November of 2007 effecting [*sic*] his perceptions and thoughts.... [U]nder the Sixth Amendment—we're offering it under the Sixth Amendment as well as 404B [*sic*] and 412, under the Sixth Amendment, anything going to the credibility of a witness that can—is something—grounds because cross-examination is the fundamental right of a defendant and it affects due process if he's not allowed to.... [T]he person's mental state at the time that, you know, he—he makes this outcry, I think is relevant and what's going on in his head. And he said that it affected his mental state.

> That's what he was in counseling for and so I think it goes in for that. I think also under Rule 412 his past sexual behavior can be for motive or bias and I think we can argue, it's up to the Jury whether they accept it, but that his motive for doing it was not only for deception, but to get attention. His relationship with his parents was bad. He was in bad trouble with them, bad trouble at school and he wanted attention so he made this outcry to get attention. We don't have to argue one theory, Judge, we can argue multiple theories and so I—I think on that as well as 404B [*sic*], this also came up as part of his knowledge of how to do this, that he knew he could do it and get people in trouble, for that grounds as well, Your Honor.

and then perform oral sex on Johnson. G.M. said that he agreed "because [he] wanted a motorcycle." The court agreed to submit a limiting instruction to the jury, admonishing that they could only consider this evidence if they first believe it occurred beyond a reasonable doubt, and only for the purpose of rebutting the defensive theories of fabrication and retaliation.

### 4. · Closing Arguments

Johnson's counsel emphasized in his closing argument to the jury that there was no physical evidence in this case, so it came down to the credibility of H.H. He recounted that, during November of 2007, H.H. was emotionally troubled because he was in trouble for shoplifting; he was in trouble at school; he didn't have any friends; he did not get along with his mother; he was in counseling; and he was caught looking at pornography. Johnson's counsel emphasized that H.H. was angry with Johnson for not giving him the Nintendo DS that he had promised him; that H.H. wanted attention; and that Jimmy, the teen group leader, felt sympathetic towards him and shared his story of being sexually molested.

The State argued that Johnson was "a deviant man who took sexual advantage of a young boy." The prosecutor reminded the jurors of G.M.'s testimony about grooming behaviors "that are almost a mirror image of what [H.H.] testified·to." Finally, the State challenged the defense's fabrication defense by arguing that H.H.'s motive to lie was not worth the price of making such an embarrassing outcry:

> So if he truly has a motive to—to obtain a Nintendo DS and he wants it so badly, is it worth it to put yourself in that light to accuse someone of sexual acts and

then go down to the Police Department and make up this huge story and remain with that and have to come into court and testify about that in front of scores of people here in a public courtroom?

### 5. The jury's verdict

The jury found Johnson guilty of one count of aggravated sexual assault of a child by causing H.H.'s sexual organ to contact Johnson's mouth; one count of aggravated sexual assault of a child by causing the penetration of H.H.'s mouth by Johnson's sexual organ; and one count of indecency with a child by touching H.H.'s genitals.[8] The jury also found the enhancement paragraph—alleging that Johnson had been previously convicted in 1980 of aggravated sodomy in Kansas—true, and assessed his punishment at life for each count. The trial court ordered the sentences to run consecutively.[9]

## C. On Direct Appeal

Johnson asserted on direct appeal to the Second Court of Appeals that (1) the trial court had abused its discretion by excluding evidence that H.H. had sexually assaulted his sister and had been adjudicated for engaging in delinquent conduct; that (2) the trial court abused its discretion by admitting evidence of his 1980 conviction for the aggravated sodomy of G.M. at the guilt/innocence phase of the trial; and that (3) his conviction for indecency with a child by contact violated his double jeopardy rights because it was subsumed into the crime of aggravated sexual assault of a child.

### 1. Panel decision overruled on rehearing en banc

A three-judge panel of the Second Court of Appeals issued an opinion on February 14, 2013, acquitting Johnson of Count III

---

8. Tex. Penal Code § 21.11(a) and § 22.021(a).

9. Tex.Code Crim. Proc. art. 42.08(a).

based on double jeopardy and reversing Johnson's convictions for the two counts of aggravated sexual assault. The reversal was based on the trial court's erroneous decision refusing to allow Johnson to put on evidence of H.H.'s prior, sexual misconduct. The panel concluded that Johnson was not allowed to present his defense and that he was harmed.[10] However, on *en banc* reconsideration, the court of appeals withdrew its February 14, 2013 memorandum opinion and judgment and issued an opinion affirming Johnson's convictions for the two counts of aggravated sexual assault of a child. The court of appeals did, however, agree that the conviction for indecency violated Johnson's double jeopardy rights and reversed that conviction.

**2. *En banc analysis of appellant's arguments***

In its opinion, the *en banc* court of appeals addressed each of Johnson's theories presented in support of admitting H.H.'s past sexual misconduct. According to the *en banc* court, Johnson first argued that the State left a false impression as to why H.H. was in counseling, which invited the admission of H.H.'s juvenile adjudication. However, the appellate court noted that Johnson, not the State, initially introduced the topic of H.H.'s voluntary counseling in late 2007 during the cross-examination of H.H.'s father. In response to Johnson's counsel's questions on cross-examination, H.H.'s father testified for the first time that H.H. was in counseling for depression, "[s]ome issues at school," and pornography. The appellate court held that John-

son could not introduce the topic of H.H.'s counseling into evidence, and then claim that the State left a false impression with the jury regarding the nature of H.H.'s counseling.[11]

Johnson's second argument was that it was necessary to admit evidence of H.H.'s past sexual assaults of his sister to show H.H.'s mental health at the time he reported Johnson's actions and at the time of his testimony. The appellate court held that the jury heard enough testimony that accurately presented H.H.'s mental health at the time of the outcry and at the time of his testimony against Johnson. The appellate court noted that the jury heard testimony that H.H. was in counseling at the time of the outcry, that he was depressed, that he had a habit of viewing pornography, that he had a strained relationship with his parents, that he had been caught shoplifting, that he was angry at Johnson for not giving him the Nintendo DS, and that he knew a report of sexual assault would get Johnson in trouble. The court of appeals cited to *Irby v. State*, noting that, "[t]he constitutional right to cross-examine concerning the witness's potential bias or prejudice does not include 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"[12]

Johnson's third argument to the appellate court was that the evidence of H.H.'s past sexual assault of his sister was admissible to challenge H.H.'s assertion that he was relieved after he told the youth-group leader about the assault. The appellate

---

**10.** *Johnson v. State*, No. 02–11–00253–CR, 2013 WL 531079 (Tex.App.—Fort Worth Feb. 14, 2013) (mem. op., not designated for publication) *opinion withdrawn and superseded by Johnson v. State*, 449 S.W.3d 240 (Tex.App.—Fort Worth 2014, pet. granted) (mem. op., en banc).

**11.** *Johnson v. State*, 449 S.W.3d 240, 246 (Tex.App.—Fort Worth 2014) (citing to *Shipman v. State*, 604 S.W.2d 182, 184–85 (Tex. Crim.App. [Panel Op.] 1980)).

**12.** *Id.* (citing to *Irby v. State*, 327 S.W.3d 138, 145 & n. 29 (Tex.Crim.App.2010) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985))).

court held, however, that "[t]he connection between [H.H.'s] relief after telling someone about Johnson and his guilt about his sister is tenuous at best."[13]  Johnson did not carry his burden to show that "the trial court's ruling was outside the zone of reasonable disagreement based on this theory."[14]

Fourth, Johnson asserted on direct appeal that the evidence should have been admitted because it was necessary to show that H.H. made a false accusation to get attention from his parents and "get himself out of trouble in the eyes of his parents." The appellate court held that "the jury had a glut of evidence by which it could be inferred that H.H. fabricated his accusation: H.H. knew such an accusation would get someone in trouble, he was mad at Johnson about the Nintendo DS, he had been caught shoplifting, he had a bad relationship with his parents, he was in counseling for his problems, and he had a pornography habit."[15]  Defense counsel was able to raise all of these grounds in his closing argument to the jury and urge that such evidence indicated that H.H. was not credible.  Therefore, said the appellate court, Johnson was not prevented from presenting this defensive theory to the jury.

Fifth, Johnson argued to the appellate court that the evidence that H.H. sexually abused his sister was necessary to show that H.H. "was not naïve about sexual behavior and knowledge of sexual matters" and to show his "knowledge that an individual can get in trouble for committing sexual acts on a juvenile."[16]  The appellate court held that "the jury was not left with the false impression that H.H. did not know that a sexual-assault accusation could get someone in trouble or that H.H. had no 'knowledge about sexual matters,' as posited by Johnson."[17]  Citing to the Supreme Court opinion in *Delaware v. Van Arsdall,* the court of appeals held that, "although the constitutional right of confrontation includes the right of cross-examination to show bias or fabrication, the trial court retains wide latitude to impose reasonable limits on such cross-examination 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' "[18]  The appellate court held that "Johnson has failed to show that the excluded evidence about H.H.'s past sexual behavior and subsequent juvenile adjudication fell outside this wide latitude and did not relate to any of the valid concerns recited in *Van Arsdall.*"[19]  The appellate court held that the trial court did not abuse its discretion by excluding this evidence.

Johnson also argued on direct appeal that the trial court abused its discretion by admitting evidence of his 1980 conviction for the aggravated sodomy of G.M. at the guilt-innocence phase of the trial.  However, the appellate court held that the trial court did not abuse its discretion by admitting evidence regarding Johnson's 1980

---

13.  *Id.*

14.  *Id.*

15.  *Id.* at 246–47.

16.  *Id.* at 247.

17.  *Id.*

18.  *Id.*

19.  *Id.* (citing to *Irby,* 327 S.W.3d at 145–54) (discussing law regarding admission of victim's status as probationer and concluding evidence not admissible because appellant failed to show "logical connection" between the victim's testimony about his sexual encounters with appellant and his separate probationary status).

conviction for aggravated sodomy "because the evidence was relevant apart from showing character—to rebut Johnson's fabrication and retaliation theories—and because the probative value of the extraneous-offense evidence was not substantially outweighed by its prejudicial effect." [20]

### D. Petition for Discretionary Review

We granted Johnson's petition for discretionary review to determine whether the court of appeals erred in holding that the trial court properly barred Johnson's cross examination of H.H. regarding the fact that H.H. had been sexually molesting his younger sister for years and, as a result, had been placed by his parents in counseling around the time that he accused Johnson of sexual abuse. [21]

In Johnson's brief in support of his Petition for Discretionary Review, Johnson states that "this issue is about the abuse not the adjudication." [22] He argues that "[t]he pre-allegation, longstanding sexual abuse of [H.H.'s] sister is approached as though it simply did not exist." [23] Johnson asserts that he was not able to fully rebut the impression created by the State in its portrayal of H.H. as a typical, innocent youth, who became troubled because he had been manipulated and preyed upon by Johnson. Johnson's counsel wanted to be able to argue to the jury that H.H.'s trou-

blesome behavior was the result of, and consistent with, H.H. *being* a sexual predator, and not because H.H. was the *victim* of a sexual predator. Johnson also argues that he was prevented from adequately presenting his defensive theory of fabrication. Specifically, Johnson asserts that H.H.'s testimony that he had sexually abused his sister for a number of years and, as a result, had been placed in counseling by his parents was admissible evidence because it was relevant to whether H.H. had a motive to falsely accuse Johnson of sexual assault. Johnson claims that H.H. wanted to garner sympathy and deflect negative attention away from him that had come as a result of having molested his sister. Johnson claims that the court's ruling prevented him from fully presenting this defense, and was, therefore, erroneous.

### ANALYSIS

We review a trial judge's decision on the admissibility of evidence under an abuse of discretion standard. [24] A trial judge abuses his discretion when his decision falls outside the zone of reasonable disagreement. [25] If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for the ruling. [26]

---

**20.** 449 S.W.3d at 249.

**21.** Johnson did not raise as a ground for discretionary review that the appellate court erred in affirming the trial court's decision to allow the extraneous offense into evidence during the guilt/innocence phase. Therefore, we will not address it.

**22.** Petitioner's Discretionary Review Brief at page 14.

**23.** *Id.*

**24.** *Tillman v. State,* 354 S.W.3d 425, 435 (Tex. Crim.App.2011).

**25.** *Martinez v. State,* 327 S.W.3d 727, 736 (Tex.Crim.App.2010).

**26.** *De la Paz v. State,* 279 S.W.3d 336, 344 (Tex.Crim.App.2009); *Laney v. State,* 117 S.W.3d 854, 857 (Tex.Crim.App.2003); *Willover v. State,* 70 S.W.3d 841, 845 (Tex.Crim. App.2002); *Romero v. State,* 800 S.W.2d 539, 543–44 (Tex.Crim.App.1990) (citing *Spann v. State,* 448 S.W.2d 128, 130 (Tex.Crim.App. 1969)).

■ An argument that evidence should have been admitted because it was offered to attack the credibility of the complainant may involve both the Confrontation Clause and the Rules of Evidence. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[27] The main purpose behind the Confrontation Clause is to secure for the opposing party the opportunity of cross-examination because that is "the principal means by which the believability of a witness and the truth of his testimony are tested."[28] Although the facts of this case are distinguishable from those in *Davis v. Alaska*, *Davis* embodies a forceful delineation of a defendant's right to cross-examine a prosecution witness to establish bias or motive. "[J]urors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on [the witness'] testimony."[29]

■ As this Court held in *Hammer v. State*, the Sixth Amendment right to cross-examine a witness allows a party to attack the general credibility of that witness "or to show their possible bias, self-interest, or motives in testifying."[30] A trial judge can abuse his or her discretion by excluding admissible evidence that is offered by the defendant to demonstrate the complainant's motive to falsely accuse him of molestation. Recently, in *Thaxton D. Johnson v. State*, this Court explained,

To that end, we have held that "it is not within a trial court's discretion to prohibit a defendant from engaging in 'otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.'" Nor, indeed, may a trial court prevent a defendant from "pursu[ing] his proposed line of cross examination" when it can be said that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had ... counsel been permitted" to do so. The Fifth Circuit has added, in this context, that until it can be "determine[d] that the cross examination satisfied the Sixth Amendment, the [trial] court's discretion" simply "does not come into play." This qualification of a trial court's discretion to limit cross-examination for bias appropriately accounts for the fact that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination[,]" and is "always relevant as discrediting the witness and affecting the weight of his testimony."[31]

■ We recognize, however, that the right to cross-examine is not unqualified. A trial judge may limit the scope and extent of cross-examination, so long as those limits do not operate to infringe upon the Confrontation Clause's guarantee of "an opportunity for effective cross-examination."[32] The defendant is not entitled to "cross-examination that is effective in whatever way, and to whatever extent,"

---

**27.** U.S. CONST. amend. VI.

**28.** *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

**29.** *Id.* at 317, 94 S.Ct. 1105.

**30.** *Hammer v. State*, 296 S.W.3d 555, 561 (Tex.Crim.App.2009) (citing to *Davis*, 415 U.S. at 316, 94 S.Ct. 1105).

**31.** 433 S.W.3d 546, 551 (Tex.Crim.App.2014) (internal citations omitted).

**32.** *Id.* at 552 (citing to *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

he might wish.[33] Trial judges retain "wide latitude" under the Confrontation Clause to impose restrictions on cross-examination based on such criteria as "harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant."[34] However, although the defendant does not have an absolute right to impeach the general credibility of a witness, the Constitution could be offended if a state evidentiary rule prohibited the defendant from cross-examining a witness concerning possible motives, biases, and prejudices to such an extent he could not present a vital defensive theory.[35]

In a case such as this, where the believability of the complainant forms the foundation of the State's case, Texas law favors the admissibility of evidence that is relevant to the complainant's bias, motive, or interest to testify in a particular fashion. "[G]enerally speaking, the Texas Rules of Evidence permit [a] defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition."[36]

In *Hammer v. State*, the trial court did not allow the defendant to present testimony and documentary evidence indicating that the complainant had lied about being sexually assaulted because she was angry with the defendant (her father) for taking her to a hospital for a sexual-assault examination after she spent the night away from home. The defendant claimed he was precluded from arguing that the complainant had lied because he had punished her for running away and having sex with her boyfriend. This Court held that the trial court's exclusion of this evidence was erroneous because it was "strong support for [the defendant's] theory that [the complainant] had a motive to falsely accuse him of sexual molestation."[37]

The Texas Rules of Evidence permit the defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition. Rule 404(b) permits the defense, as well as the prosecution, to offer evidence of other acts of misconduct to establish a person's motive for performing some act—such as making a false allegation against the defendant. Rule 613(b) permits a witness to be cross-examined on specific instances of conduct when they may establish his specific bias, self-interest, or motive for testifying. Rule 412 specifically addresses the admissibility of evidence of a victim's past sexual behavior. Such evidence is admissible if it "relates to the motive or bias of the alleged victim" or "is constitutionally required to be admitted,"[38] and if "the probative value of the evidence outweighs the danger of unfair prejudice."[39]

In this case, the appellate court held that, although "the constitutional right of confrontation includes the right of cross-examination to show bias or fabrication," the trial court has the discretion to impose

---

**33.** *Id.*

**34.** *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Lopez v. State,* 18 S.W.3d 220, 222 (Tex.Crim. App.2000); *Castle v. State,* 748 S.W.2d 230, 233 (Tex.Crim.App.1988) ("Generally, the scope of cross-examination is within the control of the trial court and in the exercise of its own discretion.").

**35.** *Hammer,* 296 S.W.3d at 562–63 (citing *Potier v. State,* 68 S.W.3d 657, 663–65 (Tex. Crim.App.2002)).

**36.** *Id.* at 563.

**37.** *Id.* at 567.

**38.** Tex. R. Evid. 412(b)(2)(C) & (E).

**39.** Tex. R. Evid. 412(b)(3) & 403.

reasonable limits on such cross-examination based on concerns, such as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[40] The appellate court held that Johnson failed to show that the excluded evidence about H.H.'s past sexual behavior and subsequent juvenile adjudication "fell outside this wide latitude and did not relate to any of the[se] valid concerns recited in *Van Arsdall.*"[41] We disagree with the appellate court's conclusion.

## A. The *Van Arsdall* concerns

■ There is no indication in the record that the trial court excluded the evidence of H.H.'s past sexual behavior because it had concerns about harassment, prejudice, confusion of the issues, witness safety, or repetitive interrogation. Even if the judge had expressed such concerns, there is no evidence in the record to support them. H.H. readily admitted, outside the presence of the jury, to being in counseling at the behest of his parents because he had been sexually molesting his sister for a number of years. He did not appear harassed or in fear of his safety, and such testimony was not repetitive of any other evidence that was before the jury. Furthermore, we fail to see how such testimony would have confused the jury regarding the issues in the case.

■ Moreover, evidence that H.H. had been sexually molesting his sister, and that his parents had placed him in counseling because of it, was clearly relevant to the issue of whether H.H. had a motive to

falsely accuse Johnson of sexual assault. Although Rule 403 gives a trial judge discretion to exclude evidence that is more prejudicial than probative, in sexual assault "he said, he said," cases such as this one, where the credibility of both the complainant and the defendant is the central, dispositive issue, Rule 403 should be used very sparingly.[42] Under Rule 403, the danger of unfair prejudice must *substantially* outweigh the probative value.[43]

At the pretrial hearing, the trial judge focused on the admissibility of evidence showing that H.H. had been charged as a juvenile for committing sexual assault. He ruled that, because the outcry in this case was made before H.H.'s juvenile charges arose, and because H.H.'s juvenile case concluded before this trial, he would not allow the defense to question H.H. about his juvenile adjudication because it was not relevant to this case. Johnson does not appear to take issue with the trial court judge's *pretrial* ruling. In fact, in his brief supporting his Petition For Discretionary Review, Johnson acknowledges that, "[a]t pretrial, the trial court had before it only this juvenile court adjudication. However, the court became fully aware of the scope of the longstanding abuse during the complainant's *voir dire* testimony."[44] It is the court's exclusion of this evidence at trial of which Johnson complains.

During trial, Johnson's argument in this regard clearly shifted. Johnson's counsel abandoned the argument that he was entitled to question H.H. about his juvenile adjudication. Rather, during trial, John-

---

40. *Johnson v. State,* 449 S.W.3d 240, 247 (Tex.App.—Fort Worth 2014) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

41. *Id.*

42. *Hammer,* 296 S.W.3d at 568.

43. Tex. R. Evid. 403.

44. *See* Petitioner's Discretionary Review Brief at page 15 (At the first pretrial hearing in October of 2009, "the only information provided was the 2008 adjudication for a single instance of abuse in April 2008.")

son's attorney focused on eliciting testimony that would reflect H.H.'s motive to accuse *at the time of his outcry.* Johnson's attorney sought to cross examine H.H. about the fact that his parents found out that H.H. had been sexually molesting his younger sister, and, as a result, they had placed him in counseling, and that all of this transpired between Spring and Fall of 2007—the same period of time that H.H. claimed he had been sexually molested by Johnson. At trial, Johnson's attorney never sought permission from the court to question H.H. about his juvenile case.[45] Johnson's defense at trial centered on his argument that H.H. had fabricated the allegations against Johnson to deflect negative attention away from him and to gain sympathy from his parents. Johnson sought to admit all evidence relevant to what was going through H.H.'s mind at the time of the outcry. It was therefore clear that Johnson's counsel had separated out that line of questioning from any questions related to H.H.'s juvenile sexual assault charge.

However, although the trial court judge allowed Johnson's attorney to question H.H.'s father and H.H. about H.H.'s being in counseling, he did not allow Johnson's attorney to specifically ask whether it was because H.H.'s parents had found out about H.H.'s longstanding sexual abuse of his sister. Johnson's counsel cited to Rule 412 and argued that H.H. had a motive to fabricate the allegations against Johnson to "get attention" because he was in "bad trouble" with his parents. Yet, the State responded by arguing that H.H.'s *juvenile adjudication* was not admissible for simple impeachment purposes because there was no connection between H.H.'s juvenile adjudication · and his motive for testifying falsely at trial. The trial court sustained the State's objection on that basis.[46] Such stated basis purported to exclude evidence that was not even being offered. The trial court judge did not address Johnson's argument that the proffered testimony was admissible under Rule 412 as evidence related to the victim's motive to fabricate the allegation against Johnson.

45. During trial, when Johnson's counsel was cross-examining H.H., he asked to approach the bench. Johnson's counsel asked the trial court for permission to question H.H. outside the presence of the jury. During this proffer, Johnson's counsel questioned H.H. about being placed in counseling by his parents because he had been sexually molesting his sister, and the effect that had on his mental state at that time. He did not ask any questions regarding H.H. being charged for sexual assault or related to H.H.'s juvenile adjudication.

46. We express no opinion with regard to the admissibility of evidence related to H.H.'s juvenile case because that was not an issue raised by Johnson in his Petition For Discretionary Review. *See Payne v. State,* No. PD–1214–11, 2013 WL 765578, *9 (Tex.Crim.App. 2013) (noting that issues not raised by the State in cross-petition for discretionary review are not before this Court for review). In fact, Johnson did not argue *at trial* for the admission of the juvenile adjudication. (As

noted above, this was a pretrial issue only). Nevertheless, the *en banc* appellate court stated in its opinion that Johnson "asked for admission of *this* evidence [the juvenile adjudication] to show H.H.'s 'emotional state in November of 2007 [a]ffecting his perceptions and thoughts.' " *Johnson,* 449 S.W.3d at 244. Based upon our review of the trial record, this is an inaccurate statement. Johnson asked for the admission of H.H.'s testimony that he had been sexually abusing his younger sister for years and had been placed in counseling by his parents because of it, *not* that he had been charged and adjudicated as a juvenile for sexual assault. Although there may have been valid arguments for the admission of evidence that H.H. had a juvenile adjudication, they were not raised at the trial level, and they were not raised in his Petition for Discretionary Review. Therefore, we will not address the circumstances surrounding H.H.'s juvenile case, the contents of the juvenile file, nor the admissibility the juvenile adjudication.

We conclude that such evidence was admissible under Rule 412 because it related to H.H.'s motive to fabricate the accusation, was constitutionally required to be admitted under the Confrontation Clause, and the probative value outweighed the danger of unfair prejudice.[47] Therefore, we hold that the trial court's decision to preclude Johnson's attorney from cross-examining H.H. before the jury regarding H.H. being placed in counseling by his parents because he had been sexually abusing his sister was an abuse of discretion.

## B. *Irby v. State* is distinguishable

In *Irby v. State*, this Court held that "a defendant must show some causal connection or logical relationship between a witness's probationary status and his potential bias to testify favorably toward the State before the witness may be cross-examined with that status."[48] As noted above, at the pretrial hearing Johnson sought a ruling from the trial court allowing him to present evidence of H.H.'s juvenile adjudication, and the trial court held that such evidence was inadmissible. However, at trial, after becoming familiar with the facts surrounding H.H.'s past sexual abuse of his sister and the resultant adjudication, it is clear that Johnson's counsel abandoned his request to admit evidence of H.H.'s juvenile adjudication and sought only to admit testimony showing that, in 2007, near the time of the alleged abuse by Johnson and H.H.'s outcry, H.H. had been placed in counseling by his parents because they had became aware that H.H. had been sexually molesting his younger sister. In 2007, when the State charged Johnson with sexually molesting H.H., it does not appear that the State knew that H.H. had been sexually molesting his sister. H.H. was not charged with that juvenile offense until 2008. Thus, there is no evidence of any link between the State's decision *to charge Johnson* with the sexual abuse of H.H., and the State's decision *to charge H.H.* with the sexual abuse of his sister. However, both the trial court and the appellate court relied on *Irby* in holding that the evidence that H.H. had been placed in counseling in 2007 by his parents, because he had been sexually molesting his sister, was inadmissible.

Johnson was seeking to have evidence admitted that was relevant to H.H.'s motive to accuse Johnson in the first place. Because Johnson was not seeking to admit H.H.'s juvenile adjudication, or facts related to such juvenile case, into evidence, the facts of this case are distinguishable from those in *Irby*. Moreover, it does not appear that Johnson was seeking to admit evidence of H.H.'s juvenile adjudication for general impeachment of H.H.'s credibility, or to show that H.H. was a bad kid (although it likely would have had that effect).[49] Johnson sought to admit evidence of H.H.'s past sexual behavior to show what H.H.'s mental state was at the time he made the outcry in this case and to show that H.H. had a strong motive for fabricating his allegations against Johnson. This evidentiary issue is distinct, and thus must be analyzed separately, from the issue of whether there is a logical relation-

---

47. Tex. R. Evid. 412(b)(2)(C) and (E), and (b)(3).

48. 327 S.W.3d 138, 140 (Tex.Crim.App.2010).

49. *See, Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (noting that there is an important distinction between an attack on the general credibility of a witness and a more particular attack on credibility that reveals "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.")

ship between H.H.'s juvenile adjudication for sexual assault and his testimony at trial.

### C. The evidence regarding whether there was a motive to fabricate was incomplete

We disagree with the appellate court's conclusion that "the admitted evidence effectively indicated H.H.'s mental health at the time of the outcry." [50]  The appellate court believed that the testimony heard by the jury—that H.H. was in counseling, that he was depressed, that he had a habit of viewing pornography, that he had a strained relationship with his parents, that he had been caught shoplifting, that he was angry at Johnson for not giving him the Nintendo DS, and that he knew a report of sexual assault would get Johnson in trouble—gave a full picture of H.H.'s "mental health" at the time he accused Johnson of sexual abuse.  It is true that such evidence went to H.H.'s mental state at that time.  However, the more important issue is whether H.H. had a motive to fabricate the allegations against Johnson.  Evidence that H.H. had been sexually abusing his sister for a number of years, and that H.H.'s parents had placed him in counseling because of it, was of no small magnitude.  The jury did not have all of the relevant evidence pertaining to the issue of whether H.H. may have had a motive to fabricate the sexual assault allegation against Johnson because the court did not allow in the evidence of H.H.'s sexual abuse of his sister, the discovery of it by H.H.'s parents, and the resultant placement of H.H. in counseling.  The general "troubled child" evidence was downplayed by H.H.'s father, and thus relatively weak without the additional evidence that they had discovered that H.H. had been sexually molesting his sister.

### D. There was not a "glut" of evidence supporting defense's fabrication theory

█ We disagree with the appellate court's conclusion that there was already a "glut of evidence" heard by the jury supporting Johnson's fabrication defense.  It is true that, with the evidence presented, Johnson was not wholly prevented from presenting his theory of fabrication.  However, the excluded evidence of H.H.'s past sexual abuse of his sister would have added further support to that theory.  The excluded testimony regarding H.H.'s parents' decision to place him in counseling because he had sexually abused his sister was relevant to Johnson's defense that H.H. had a motive to fabricate the accusations so that he would appear sympathetic to his parents as a victim of sexual assault, rather than as a perpetrator of sexual assault.  An accused is given wide latitude to show any fact "which would tend to establish ill feeling, bias, or motive for fabrication on the part of any witness testifying against the accused." [51]  We have held that "[t]his latitude is exceeded only when the trial court exercises its discretion to so drastically curtail the defendant's cross-examination as to leave him 'unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial.'" [52]  Although subtle, it was error nevertheless because the jury "might have received a

**50.** *Johnson,* 449 S.W.3d at 246.

**51.** *Richardson v. State,* 744 S.W.2d 65, 79 (Tex.Crim.App.1987), *vacated on other grounds* 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989).

**52.** *Thaxton D. Johnson,* 433 S.W.3d at 555 (citing to *Davis,* 415 U.S. at 318, 94 S.Ct. 1105).

significantly different impression of [H.H.'s] credibility had [Johnson's] counsel been permitted to pursue his proposed line of cross-examination." [53]

In fact, the State was allowed to present extraneous offense evidence during the guilt/innocence phase that Johnson had committed a similar sexual assault several years earlier. This evidence was permitted to rebut the defensive theory of fabrication and retaliation. We were not asked, and thus do not address, whether the admission of this extraneous evidence during the guilt/innocence phase was proper. It would appear that this extraneous offense evidence was likely very compelling evidence in support of the State's case, even in light of the "limiting" instruction given to the jury. Yet, although the State was given the opportunity to rebut Johnson's defensive theory of fabrication with this extraneous offense evidence, Johnson had not been given the opportunity to fully and completely explore such defensive theory through the requested line of cross-examination. This imbalance undercuts the appellate court's conclusion that the jury was given ample evidence to weigh H.H.'s state of mind at the time of the outcry.

## CONCLUSION

We hold, therefore, that the trial court judge erred by not permitting Johnson to cross examine H.H. regarding H.H.'s past sexual abuse of his sister. Such evidence supported Johnson's theory that H.H. had, at that time, a motive to falsely accuse Johnson of sexual molestation, and the jury should have been allowed to weigh such evidence along with the rest of the evidence presented. The appellate court erred in holding that the trial court judge did not abuse his discretion by excluding this evidence. We reverse the decision of the court of appeals and remand the case to that court for a harm analysis under Texas Rule of Appellate Procedure 44.2(a).

Keasler, J., filed a dissenting opinion in which Keller, P.J., and Hervey, J., joined. Newell, J., concurred in the result.

Keasler, J., filed a dissenting opinion, in which Keller, P.J., and Hervey, J., joined.

The Court concludes that H.H.'s sexual abuse of his sister he committed as a juvenile "was admissible under Texas Rule of Evidence 412 because it related to H.H.'s motive to fabricate his accusation, was constitutionally required to be admitted under the Confrontation Clause, and the probative value outweighed the danger of unfair prejudice." [1] I dissent because neither Rule 412 nor the Confrontation Clause requires the evidence's admission. Further, as a result of its incorrect interpretation of Rule 412 and the Confrontation Clause, the Court misapplies the standard of review.

Texas Rule of Evidence 412 permits the admission of a victim's past sexual behavior if the evidence relates to the victim's motivation or bias and the evidence's probative value outweighs the danger of unfair prejudice. [2] While H.H.'s sexual abuse of his sister may have some minimal relevance relating to his motivation or bias to inculpate Johnson, the probative value of this evidence certainly does not outweigh the danger of unfair prejudice to H.H. First, the probative value of the evidence is objectively weak. That H.H.'s sexual acts committed as a juvenile bore directly on H.H.'s motivation to accuse Johnson of sexual assault because it would deflect

---

**53.** *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431.

**1.** *Ante,* at 913.

**2.** Tex. R. Evid 412(b)(2)(C) & (b)(3).

H.H.'s own blameworthiness for his own misdeeds is a tenuous connection at best.[3] Second, the Court wrongly concludes that the record does not contain any unfair prejudice because, on review of the cold record, H.H. "readily admitted, outside the presence of the jury, to being in counseling at the behest of his parents because he had been sexually molesting his sister for a number of years."[4] He indeed answered the question; but as a reviewing court, "readily" is not an adjective this Court gets to use on this record.[5] H.H.'s answers to counsel's questions under the assumption he was required to give them (and outside of the jury's presence) does not support the Court's claim that the record fails to reflect prejudice. The Court does not consider the potential prejudice to H.H. had he been forced to discuss the particulars of his sexual transgressions against his sister in front of twelve strangers in open court, even though the Court concedes the evidence would tend "to show that H.H. was a bad kid."[6] Texas, like other states, places an important interest in protecting juvenile offenders' anonymity.[7] "Our Family Code and Rules of Evidence explicitly protect that anonymity."[8] Because the evidence's minimal probative value was outweighed by a great danger of unfair prejudice, the court of appeals correctly held that the trial court did not abuse its discretion.

The Court correctly states that a defendant's rights to confront and cross-examine witnesses are not unqualified. Trial judges " 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination,' so long as those limits do not operate to infringe upon the Confrontation Clause's guarantee of 'an *opportunity* for effective cross-examination.' "[9] The Confrontation Clause does not guarantee cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.[10] Our opinion in *Hammer v. State* recognized that the Confrontation Clause may warrant the admission of evidence even if that evidence would normally be barred under our evidentiary rules.[11] We further clarified the point in holding that "the constitution is offended if the state evidentiary rule would prohibit [a defendant] from cross-examining a witness concerning possible motives, bias, and prejudice to such an extent that he could not present a vital defensive theory."[12] In *Hammer*, we held that the trial court abused its discretion by prohibiting cross-examination of the alleged victim with her past false accusations of sexual misconduct on the state

---

3. See *Irby v. State*, 327 S.W.3d 138, 152 (Tex. Crim.App.2010) (interpreting *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and requiring a "logical connection between the evidence suggesting bias or motive and the witness's testimony.").

4. *Ante*, at 911.

5. See, e.g., *State v. Mendoza*, 365 S.W.3d 666, 669 (Tex.Crim.App.2012) (recognizing this Court's limitations in rendering qualitative opinions about witnesses' testimony).

6. *Ante*, at 913.

7. *Irby*, 327 S.W.3d at 152.

8. *Id.* (referencing Texas Family Code § 51.13(b) and Rule of Evidence 609(d)).

9. *Thaxton Johnson v. State*, 433 S.W.3d 546, 551–52 (Tex.Crim.App.2014) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (emphasis in original).

10. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431.

11. 296 S.W.3d 555, 567–68 (Tex.Crim.App. 2009).

12. *Id.* at 562–63.

evidentiary grounds, not that the Confrontation Clause required its admission.[13] The Court noted that the Confrontation Clause might have required admission of the past false accusations "if appellant had not been able to show that motive [to fabricate] through other means."[14] However, because Hammer presented to the jury his general defensive theory through alternate testimony, the evidence's exclusion did not offend the Confrontation Clause.[15]

Like Hammer, Johnson was able to establish the victim's motive to fabricate his sexual-assault claims against him and advance a substantial defensive theory. On cross-examination, Johnson elicited testimony from H.H. that he (1) knew his allegation would get Johnson in trouble, (2) was mad at Johnson for not giving him the Nintendo game system, (3) had been caught shoplifting, (4) had a poor relationship with his parents, (5) was in counseling for a variety of problems, (6) and had a pornography habit. Johnson's counsel used all of these developed points to undermine H.H.'s credibility in closing arguments. Because Johnson had the opportunity to establish H.H.'s potential ill motive and bias towards him, the Confrontation Clause did not require admission of H.H.'s specific conduct as a juvenile.

The Court concludes that admission of H.H.'s juvenile sexual acts were necessary to satisfy the Sixth Amendment's right to confrontation not because without it he could not present a vital defensive theory, but rather because without the evidence, the defensive theory was not as strong as the majority thinks it could have been. The Court's stated rationale is that, while Johnson was able to impeach H.H., the specific acts of juvenile conduct "would have added further support to [the motivation] theory."[16] That is simply not the test to determine the scope of cross-examination demanded by the Confrontation Clause.[17]

As long as the judge permits sufficient cross-examination to satisfy the Sixth Amendment, the trial judge has the ability to restrict the scope of cross-examination.[18] When a trial judge decides to limit or exclude topics from cross-examination, his decision will be reviewed for an abuse of discretion.[19] After Johnson elicited H.H.'s testimony, he had effectively established H.H.'s bias and the trial court did not abuse its discretion by preventing Johnson from presenting evidence "tending only marginally to enhance his allegation of bias against the witness."[20] In light of the marginally relevant evidence that must be balanced against its weighty prejudice potential, the Court's judgment reflects a *de novo* standard of review, instead of the proper deferential abuse-of-discretion standard. Because the Sixth Amendment did not require the evidence's admission, the decision to prohibit its admission was reasonable and fell within the judge's wide latitude and the zone of reasonable dis-

---

13. *Id.* at 567–68, 570.

14. *Id.* at 567–68.

15. *Id.* at 568.

16. *Ante,* at 914.

17. *See Thaxton Johnson,* 433 S.W.3d at 557 ("[A] 'less than optimal' opportunity for cross-examination does not, of itself, violate the Sixth Amendment.").

18. *Id.* at 551–52.

19. `See Hammer,* 296 S.W.3d at 562–63; *Castle v. State,* 748 S.W.2d 230, 233 (Tex.Crim. App.1988) ("Generally, the scope of cross-examination is within the control of the trial court and in the exercise of its own discretion.").

20. *See Thaxton Johnson,* 433 S.W.3d at 557.

agreement to limit Johnson's method of cross-examination. The court of appeals rightly concluded as much, and the Court should affirm its judgment.