

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00042-CR

_____

ALAN MATTHEW WHITE, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1537841R

---

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

In a single issue on appeal from his convictions and concurrent sentences for six counts of aggravated sexual assault and one count of aggravated assault with a deadly weapon, Alan Matthew White contends that the trial court erred by denying his request to cross-examine the complainant about evidence that he claims was relevant to his defense under Rules 401 and 402 and not excluded under Rule 412. Tex. R. Evid. 401–02, 412. We affirm.

## Background

White was charged in a single, amended indictment with six counts of aggravated sexual assault and one count of aggravated assault with a deadly weapon, alleged to have been committed in the same criminal episode. White pleaded not guilty, and the case was tried to a jury.

The complainant testified that she dated White for a few months and then moved in with him; eventually, they got engaged and planned a wedding. But the complainant ended their relationship a couple of weeks before the wedding. White did not take the breakup "well at all"; "[h]e was very vindictive" and threatened to sue her. But after some time without any contact, they eventually "start[ed] hanging out as friends." White helped the complainant go through a hard time with her brother. The

complainant testified that during this time White "knew about [her] dating life" and did not like her boyfriend at the time, Ed.[1]

The complainant testified that after several months of friendship, White wanted to try dating her again; at first, she "warmed up to the idea" but then changed her mind "within a day." Nevertheless, the two did engage in a consensual "physical" relationship once. Even though the complainant did not want to continue dating White, they remained friends. Her relationship with Ed had become "[p]retty toxic," and she frequently talked to White about it.

Eventually, the complainant noticed that White's mental health was declining, and she told him they could no longer be friends. He again did not take her decision well. He became suicidal and disappeared; his family could not locate him. The complainant was able to reach White by phone and told him to come back home, but White interpreted her message as saying to come to her house. Instead, she proposed meeting him in a public place, but he was agitated and refused to talk until she went to his house. The complainant did so, but she left without any intention of returning because she no longer felt safe with White. He was erratic and suicidal, and he had a gun.

After the complainant left White's house, she saw her brother and then went out drinking with a male friend. White was not happy she was going out, and he

---

[1]We use a pseudonym to refer to the complainant's boyfriend. *See* Tex. Const. art. I, § 30(a)(1) ("A crime victim has the . . . right to be treated with . . . respect for the victim's . . . privacy throughout the criminal justice process.").

"continuously bl[ew] up [her] phone to the point [she] had to turn [it] off." In some of his text messages, he told the complainant that he wanted "to hook up that night." Before turning off her phone, she told him she didn't want to do that. After going out, she spent the night with Ed. In later texts with White, he accused her of having sex with Ed that night, which she denied. White's texts continued to be accusatory[2] and emotionally manipulative, repeatedly threatening suicide.

Before returning to her own home, the complainant saw a message from White that said he had driven by her house and that he knew she had spent the night elsewhere. It unnerved her. The State introduced into evidence text messages between White and the complainant occurring over the next two days. In them, White repeatedly threatened imminent suicide and faulted the complainant for not coming over to have sex with him "one last time" before he finished his plan to kill himself. He told the complainant that he had been forced to hire prostitutes and use drugs instead of having sex with her before dying. The complainant asked White more than once if he intended to rape her.

After receiving a text from White once again threatening imminent suicide, the complainant stopped getting texts from him, and she fell asleep on her couch. The next morning, she woke up and saw White standing in her house. He grabbed her

---

[2]One of White's texts read, "I can't even get the physical part of you. You'd rather have others." During the State's direct examination, the complainant alluded to her "sexual relationship" with Ed, and White's text messages admitted into evidence reference more than once her having sex with Ed.

phone and sat down; he had a gun in his hand. He threatened to kill himself in front of her.

White told the complainant he wanted to look in her phone, but she told him no because he wouldn't "be happy with what" he saw; she had also been texting with Ed, and she did not want White to see the messages because that relationship "had historically been a sensitive subject for him." He became angry and put her in a chokehold until she unlocked the phone for him. He had never "been physical with" her in that way before. White pointed the gun at her while scrolling through her phone. He became angry while reading her texts with Ed.

White then held the gun on the complainant and—over the course of several hours—sexually assaulted her via six different acts. Eventually, White allowed the complainant to call her mother, and the complainant asked her to come to the house. White left before the complainant's mother arrived. He asked the complainant to walk him to his car; he was struggling to see and walk, and she had to hold onto him until he reached the car. As soon as he left but before her mother arrived, the complainant called the police.

The responding officer testified that when he arrived shortly after noon, the complainant was "very distraught, upset, crying[, and v]isibly shaken." The

complainant's mother drove her to the hospital where a sexual-assault nurse examiner (SANE) performed a physical examination and took swabs for DNA analysis.[3]

Meanwhile, a Fort Worth police officer responded to a call about an unconscious person at a gas station. When the officer arrived, he found White unconscious in his car with a firearm next to him on the seat. White did not regain consciousness even when the officer broke the window to take the gun, when the responding fire department removed him from the car, and when the officer used White's thumb to unlock the phone found in the car. The gun the officer found in the car was unloaded, and there was no magazine with it. White was taken to the same hospital where the complainant was being examined.

The trial court admitted White's hospital record from that day, and the SANE read from the notes, which referenced White's "altered mental status," history of suicide attempts, and then-current suicidal ideation. The SANE also read the following:

> The patient states that he became upset after he found out that his ex-girlfriend had slept with her ex-boyfriend. He said that he has been trying to fix their relationship including setting up couples counseling.
>
> He says that his ex-girlfriend agreed to the counseling before he found out that she had already reconnected with her ex-boyfriend and was having sex with him. He states that all he wanted to do was quote, please her, unquote.

---

[3]The SANE testified that at the hospital, the complainant was "[c]rying, upset, [and] sobbing."

The complainant and a victim's assistance advocate all testified that the complainant had panicked after she thought she had seen White's car at the hospital. She ran back into the hospital and hid in the women's restroom. The victim's assistance advocate found the complainant "[e]motionally very distraught, crying, hysterical[,] and barely able to breathe." Eventually, the complainant was able to leave and go home. But she was unable to actually live in her house until a year to two years after the assaults.

When the swabs taken from the complainant at the hospital were tested, DNA from the vulvar swab matched DNA from White's buccal swab. Additionally, although police had searched the complainant's home at the time of the assaults, they found no gun evidence. But when the complainant eventually moved from her home, a gun clip fell out of her couch when she was moving it.

After hearing the foregoing evidence, the jury found White guilty of all charged counts and, after hearing punishment-related evidence, assessed his punishment at fifty years' confinement for two of the aggravated sexual assaults, twenty-five years' confinement for one of the aggravated sexual assaults, seventeen years' confinement for each of the other three aggravated sexual assaults, and twenty years' confinement for the aggravated assault with a deadly weapon. The trial court ordered the sentences to run concurrently.

In a single issue on appeal, White argues that the trial court improperly limited his cross-examination of the complainant by denying him the right to ask her

7

questions about her desire to marry Ed and have him "all to herself." According to White, this evidence supported his "only theory of defense": that the complainant had a motive to lie and fabricate her testimony because she did not want to admit to Ed that she had sex with White consensually.

**Limitation of Cross-Examination**

During his cross-examination of the complainant, White asked the trial court to question her about "some possible 402 stuff about past relationship . . . – well, relations with [Ed] at the time." The trial court allowed White to conduct a voir dire examination of the complainant, in which he elicited that

• the complainant and Ed were dating when she and White became friends again;

• when White was missing and the complainant thought he was out of state, she and Ed "were talking about continuing [their] relationship";

• she had told Ed about her "communication with" White;

• she and Ed had a sexual relationship;

• Ed "had commitment issues";

• nevertheless, she had texted Ed that she wanted to have a family and life with him;

• the day before the assaults, she had a text conversation with Ed about an ex-girlfriend moving in with him and in that conversation told Ed that it would not be a good idea to let his ex-girlfriend move in with him because "females are the most manipulative creatures on this earth"; and

• the complainant was worried about Ed's "bringing the ex-girlfriend in" and thought she might take Ed away from her; she even offered to let Ed move in with her and told him that she would pay for him to break his lease to do so.

8

White contended at trial that the above evidence was admissible because the State had opened the door by eliciting testimony about the complainant's and Ed's relationship and also because it was relevant to White's "defensive theory . . . that she was worried . . . her current boyfriend [would] find[] out that she might have slept with" White and therefore had "a reason to make something up." The State responded that "a significant portion of this calls for hearsay from" Ed, that "[t]hese are specific past sexual acts . . . [and it would be] improper to bring them into this case," and that—if the defensive theory was that the sex was consensual—the State had two witnesses available to testify "that consent is a problem for" White and allowing this testimony would open the door to those witnesses' testimony.

After White argued again that this evidence was relevant and would fit into Rule 412's narrow motive-and-bias exception—and thus not be barred by that rule—the trial judge acknowledged that although "412 does come into play . . . the discussions on . . . e-mail going back and forth on the phone with another person is not relevant to whether or not Mr. White engaged in sexual assault of another person."[4] Therefore, the trial court denied White's request to question the complainant about the evidence.

---

[4]Based on the voir dire testimony, the attorneys' arguments, the trial judge's ruling, and the exhibit the trial judge admitted for the record only, we can tell the substance of the excluded evidence by context, as well as the reasons why White thought it should be admitted. Thus, White preserved his appellate complaint. *See* Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); *Golliday v. State*, 560 S.W.3d 664, 670–71 (Tex. Crim. App. 2018).

**Applicable law**

We review a trial judge's admissibility decision for an abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). The trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* But if the evidentiary ruling is correct under any applicable theory of law—even if the trial court gave a wrong or insufficient reason for the ruling—we will not disturb it. *Id.*

An accused is given wide latitude to present evidence of any fact tending to show a witness's ill feeling or bias toward, or motive to fabricate against, the accused. *Id.* at 914. But a trial court does not abuse its discretion in excluding such evidence unless it "so drastically curtail[s] the defendant's cross-examination" that the defendant is unable to make a record from which to argue the witness's bias or partiality, such as when the trial court forecloses all inquiry into a form of bias or a reasonable jury is left with a significantly different impression of the witness's credibility than it would have been able to see with the cross-examination. *Johnson v. State*, 433 S.W.3d 546, 555 (Tex. Crim. App. 2014) ("[M]erely establishing the relevancy of proffered evidence does not *necessarily* guarantee its admissibility.").[5]

---

[5]Stated another way, "The test to determine the scope of cross-examination demanded by the Confrontation Clause is whether the defendant could present a vital defense theory without the evidence, not whether the defensive theory is as strong as it could be with the evidence." *Faglie v. State*, No. 03-17-00281-CR, 2019 WL 847812, at *4 (Tex. App.—Austin Feb. 22, 2019, pet. filed) (mem. op., not designated for publication) (citing *Johnson*, 433 S.W.3d at 557).

**Analysis**

On appeal, White claims that the evidence that the complainant was afraid to lose Ed, wanted a long-term commitment with him, and was worried about the possibility of his ex-girlfriend's moving in with him was relevant because it showed the complainant had a motive to fabricate her testimony that the sex with White was nonconsensual and because it rebutted her testimony that her relationship with Ed was "toxic," as she had claimed. White therefore complains that the trial court took away his "only" defensive theory.

White's argument rests on the assumption that the evidence the jury heard about the complainant's relationship with Ed would have left the jury with the false impression that the relationship was casual, or openly nonmonogamous, or that the complainant was not intending to continue dating Ed. But although the complainant testified five years after the fact that her relationship with Ed in 2017 was toxic does not mean that it wasn't serious or that the jury was left with the false impression that she had no motive to hide from Ed that she might have had consensual sex with others.[6]

In fact, the jury heard that the complainant and White discussed her relationship with Ed; that White had urged her to stop dating Ed; that her relationship

[6]Nor is there any evidence of how or why Ed would have found out that White was at her house on the day of the assaults, much less that he had sex with the complainant. As the State notes in its brief, when the complainant called her mother and the police, "only two people knew what [had] unfolded," and "fear of discovery would provide [the c]omplainant with motive to remain silent."

with Ed was sexual; that White had expressed jealousy about that sexual relationship and tried to use that jealousy to manipulate her into have sex with him;[7] that—despite White's expressed desire to have sex with her and his warnings about Ed—she refused to see White and instead spent the night with Ed;[8] that her "boyfriend" was present at the hospital when she went to be examined; and that she told the SANE that she had engaged in consensual sex within the last seven days before the assaults. Thus, to the extent that the jury heard evidence about the nature of the complainant's relationship with Ed, it was consistent with the excluded evidence, thus diminishing any relevance that the excluded evidence might have had. *See Miles v. State*, 468 S.W.3d 719, 724 (Tex. App.—Houston [14th Dist.] 2015) (noting that whether evidence is relevant requires a court to examine the purpose for which it is being introduced to determine if a direct or logical connection exists between the actual evidence and the proposition to be proved), *aff'd*, 506 S.W.3d 485 (Tex. Crim. App. 2016); *cf. Austin v. State*, No. 02-18-00484-CR, 2019 WL 6205247, at *7, *10 (Tex. App.—Fort Worth Nov. 21, 2019, pet. ref'd) (mem. op., not designated for publication) (applying same relevance analysis to different facts and concluding that, "[t]hough perhaps not to the

[7]The complainant testified that when White read her texts with Ed before the assaults, he was upset; she "vividly remember[ed] him saying [Ed] is not going to be the last person you had sex with before I die."

[8]The jury also heard that the complainant had sent explicit photos of herself to Ed; that White saw those photos on her phone and was angry; that although she had never sent White any of those photos, some of them were sent to White's phone around the time the assaults were occurring; and that the complainant thought White himself had sent those photos to his phone while he had access to her phone.

degree desired by Appellant, the record contains numerous references to the complainant's psychiatric treatment and hardly left the impression that the complainant was untroubled").

During cross-examination, the complainant admitted that—even after she had broken her engagement with White—she traveled to Las Vegas with him and their families and stayed in the same hotel room with him; that he had continued to live with her for a short time after their breakup and that at the time of the assaults, she still received some of his mail; that she had contacted him several months after their breakup to talk with him about her brother's health problems, thus initiating the renewed contact; that she had done so because White was a sympathetic listener; and that after they renewed their contact, she had consensual sex with White one time.

The complainant likewise freely admitted during cross-examination that she did not remember many details about the timing and other aspects of the assaults because five years had elapsed between the assaults and trial. She also agreed that she had intentionally avoided thinking about what had happened. She admitted that she had initially told the police that she was not scared for her safety when White came to her house and was instead afraid that he would hurt himself. The complainant agreed that she had not said that she needed help when she texted her coworker on the morning of the assaults. Finally, she answered, "It rings a bell," when asked, "[D]o you recall telling the detective that you showered that morning with [White]?"

Although not to the extent he wanted, White was able to challenge the complainant's credibility. During closing argument, his counsel noted her inability to recall certain details; for example, he argued that there was no way White could have been stumbling and unable to stand while leaving her home after the assaults—as she had testified—and then have managed to drive himself to a gas station twenty minutes away. He pointed out that the complainant's cell phone records showed that she was "getting and sending texts throughout th[e] time" of the assaults. He reminded the jury that her relationship with White was "fine" while they were engaged and that it was the complainant who had later contacted White to renew their friendship. Counsel even used the text messages themselves to argue that it was their discussion of rape that had planted the idea in her mind to accuse White of the assaults. Finally, counsel highlighted two ways the evidence purportedly conflicted; according to counsel (1) the assault details that the complainant described to the SANE varied from the details that the complainant testified to at trial[9] and (2) the complainant had forgotten about one of the assaultive sex acts during direct examination and "had to be reminded on the redirect by the State."[10]

---

[9]Counsel even argued that the SANE wanted White to be convicted, as evidenced by her demeanor with the prosecution versus the defense.

[10]The State did not ask this question on redirect; instead, the prosecutor asked the complainant about this sixth act specifically during her direct examination of the complainant.

After comparing the excluded evidence to the rest of the evidence at trial, we conclude that the trial court did not so drastically curtail White's cross-examination to the extent that he was unable to make a record from which to argue bias, partiality, or motive to fabricate; the trial court's ruling did not foreclose all inquiry into a form of bias, nor was the jury left with a significantly different impression of the complainant's credibility than it would have been able to see with the requested cross-examination. *See Johnson*, 433 S.W.3d at 557. Thus, the trial court did not abuse its discretion by limiting White's cross-examination of the complainant.

## Conclusion

We overrule White's sole issue and affirm the trial court's judgments.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 23, 2023