

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00057-CR

_____

NIRAJ SHARMA, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 2
Denton County, Texas
Trial Court No. CR-2022-06089-B

---

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I.  Introduction and Procedural Background

A jury found Appellant Niraj Sharma guilty of assault causing bodily injury to a family member.[1]  The trial court sentenced Appellant to 250 days' confinement in the Denton County Jail and assessed a $1,500 fine but then suspended the imposition of the jail sentence and placed him on community supervision for twenty-four months.  Appellant filed a motion for new trial arguing that the trial court had erroneously excluded impeachment evidence related to the complainant.  The motion was presumably overruled by operation of law,[2] and Appellant appealed, raising as his sole issue the exclusion of "impeachment evidence" and arguing its admissibility under the Confrontation Clause and Texas Rule of Evidence 613.  Because Appellant did not preserve his Confrontation Clause challenge, because he did not meet the requirements of Rule 613(a) or (b), and because the trial court's decision to exclude the evidence was proper on other grounds, we affirm.

## II.  Factual Background

### A.    Appellant's History of Assaulting the Complainant

The complainant testified that she married Appellant in India on June 25, 2014, and that he began assaulting her two days later.  The complainant separated from

---

[1]The victim was Appellant's wife at the time of the incident but was his ex-wife by the time of the trial.  For the sake of consistency, we refer to her as the complainant throughout the opinion.

[2]No order disposing of the motion for new trial appears in the record.

Appellant around the end of October 2014, and they remained separated through December 2014. During that time, the complainant filed a complaint with the police in India.[3] Appellant admitted that he knew that what he had done was wrong, and the complainant reconciled with him.

The complainant testified that Appellant resumed assaulting her after they reconciled. She described at least nine incidents in which he assaulted her, including while she was pregnant with each of their two daughters.

During one incident that occurred in November 2018 while the couple was living in an apartment in Irving,[4] Appellant threw a water bottle at the complainant while she was doing the dishes; he also dragged her on the carpet, causing her pants to rip, and hit her several times with his hand. The complainant could not recall at trial what had angered him but said that he was shouting and yelling so loudly that a neighbor had called the police. When the police showed up at their apartment, the complainant told the police that Appellant had been watching television and was on the phone and that he had gotten excited and had used a higher volume than normal. She admitted at trial that she had lied to the police. The complainant explained that at that time, she had believed that telling anyone about Appellant's violence "would have

---

[3]On cross-examination, the complainant testified that she had filed a complaint for family violence plus dowry violations.

[4]The couple moved to the United States in 2017.

3

led to more violence in the house." Additionally, Appellant told her that no one would believe her.

The complainant said that verbal abuse (including his cursing at her in their native language) occurred more frequently than the physical violence. After most of the violent incidents, Appellant told the complainant that he was sorry and cleaned the house to apologize. She was expected to smile and behave as if nothing had happened because he believed that if he said he was sorry, "that should be enough."

## B. The Assault at Issue

The complainant testified that on February 13, 2022, the day of the underlying incident, groceries had been delivered to the couple's home in Frisco, and their daughters wanted to bring them inside. Appellant, who was on the phone with his family, told the complainant that he wanted their daughters to put on jackets before retrieving the groceries. The complainant offered to retrieve the jackets, but Appellant said that he would get them. The complainant told him where the jackets were located, but he could not find them. She then went to the stated location and retrieved the girls' jackets. After that, Appellant got "very upset." He told his family (who was still on the phone) that she was not a good mother. The complainant told Appellant not to talk like that and gave him a displeased look.

After the complainant put away the groceries and Appellant finished his phone call, she told him that it was not right for him to speak ill of her in front of their children. Appellant said, "[Y]ou don't have brains to talk." He went to the kitchen

4

area and asked for breakfast; the complainant told him to cook it himself. Appellant cursed, yelled at her, and took her phone that had been charging in the kitchen. The complainant put out her hand and asked Appellant to give her the phone, but he slapped her hand and said that it was his phone because he had paid for it. Appellant then dragged the complainant from the kitchen to the bedroom. Once in the bedroom, Appellant "did something on [the complainant's] head and then pushed [her] down." He then kicked her left side multiple times. Appellant left the room but returned and threw the complainant's phone at her.

When the complainant eventually stood up, it hurt. She testified that she had felt pain in her neck, arm, and thighs; that she had taken pain killers; and that she had a limp.[5]

Later that day, the complainant called her sister and told her what had happened, stating that it was "becoming difficult to live in this house." The complainant's sister then showed up at the couple's home.

The complainant's sister testified that when the complainant opened the door, she was limping. The complainant's sister saw swelling; the complainant would not allow her to touch the area because "[i]t was hurting." After the complainant

---

[5]The complainant went to the emergency room the next day, and a physical examination revealed that she had a limping gate, as well as tenderness and/or swelling in various places on the left side of her body. The diagnosis was "physical assault by bodily force and multiple contusions to the left upper arm and left thigh."

explained what had caused her to limp, her sister was angry and went upstairs to confront Appellant.

When the complainant's sister asked Appellant why he had hit the complainant, he did not deny the action but instead told her to get out of his house. But when the complainant's sister asked why Appellant had taken the phone, he said, "I know what I did was wrong. I shouldn't have done it."

When the sister left, she stayed on the phone with the complainant until she confirmed that she was safely in her bedroom. The sister did not call the police that day because the complainant did not want her to.

The following morning, the complainant's sister called to check on the complainant and became concerned for her safety. The complainant put her sister on speaker phone, and she asked Appellant what was going on. He yelled at the sister, and then the call got disconnected. The complainant's sister tried calling back multiple times, but no one answered. The complainant's sister then called 911 so that the police could see if "[t]he previous day's incident [was] happening again."

When the police arrived, they noticed that the complainant was limping. One of the officers testified that he did not see anything that indicated that she was faking or that her injuries were an accident. Based on hearing both the complainant's and Appellant's stories, the officers opined that Appellant had assaulted the complainant the prior day, that she had suffered bodily injury, and that she had been a victim of domestic violence.

## C.     The Defensive Theory

At trial, Appellant attempted to show that the complainant was not truthful and had fabricated the domestic-violence incident to obtain a visa that allowed her to work. On cross-examination, the defense asked if the complainant had obtained such a visa, and she said that a nonprofit organization had prepared the paperwork that she had signed to obtain a work visa. The complainant agreed that she had come to the United States on a dependent visa—Appellant's work visa that did not allow her to work. She further agreed that she now had a "u visa"[6] that the nonprofit organization had helped her obtain based on her status as a family-violence victim. Defense counsel tried to get the complainant to admit that she had only come forward with the family-violence accusation to get away from Appellant and to obtain her own visa, but she explained that she had told the police what had happened, that the police had directed her to a victim-advocate agency, that "[t]hey did what they did," and that she was not aware of much of it. Defense counsel further attempted to get the complainant to admit that she had discussed trying to get a visa to stay in the United States by claiming family violence, but the complainant said that "[t]here was no discussion about any immigration-related issue"; instead, the discussions that she had

---

[6]This term was not defined at trial. However, this court has previously defined "U-Visa" as "an immigrant permit for victims of violent crime." *See Chavez v. State*, No. 02-22-00090-CR, 2023 WL 7400981, at *1 n.2 (Tex. App.—Fort Worth Nov. 9, 2023, pet. ref'd) (mem. op., not designated for publication) (quoting *Aguilar v. State*, No. 02-14-00119-CR, 2015 WL 1775634, at *1 (Tex. App.—Fort Worth Apr. 16, 2015, no pet.) (mem. op., not designated for publication)).

with her sister on February 13 and 14 were about how she needed a divorce because she could not survive in the marriage. Defense counsel again tried to get the complainant to agree that she and her sister "had concocted this whole thing so that [the complainant] could apply for a visa to stay here." The complainant reiterated that they had not discussed immigration, only divorce.[7]

Defense counsel introduced over the State's relevance objection the couple's agreed divorce decree. Counsel then asked the complainant whether the decree contained a finding of family violence; she admitted that it did not.[8] She explained that she had signed the agreed decree even though it did not have a family-violence finding because the case had been prolonged for almost two years and she wanted it to be over.

### III. Exclusion of Impeachment Evidence

In his sole issue, Appellant argues that the trial court abused its discretion by excluding impeachment evidence when he questioned the complainant. Appellant never specifically defines what the term "impeachment evidence" refers to, he merely sets forth record cites showing where he attempted to introduce such "impeachment evidence." The State, in its brief, has set forth the relevant portions of the record and

---

[7]During redirect, the complainant testified that she had known nothing about how to change a visa before her meeting with the victim advocate.

[8]The complainant explained that there was a family-violence finding in the temporary orders but that it was not carried forward to the final decree after their mediation.

8

has identified the impeachment evidence as (1) questions concerning the Hindu Marriage Act, (2) the couple's certificate of marriage under the Hindu Marriage Act (the marriage affidavit), and (3) the Application Document (the visa application). Within his sole issue, Appellant raises arguments based on the Confrontation Clause and Texas Rule of Evidence 613(a) and (b). Appellant, however, did not preserve his Confrontation Clause argument by raising it first in the trial court, and he did not meet the requirements of Rule 613(a) or (b). Moreover, the trial court's exclusion of the marriage affidavit and the visa application can be upheld on other grounds, which are discussed below.

### A. Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court does not abuse its discretion as long as the decision to admit or exclude evidence is within the zone of reasonable disagreement. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). We review the trial court's ruling in light of what was before the trial court when it ruled. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

**B.     What the Record Shows**

At the crux of Appellant's evidentiary issue is an attack on the complainant's credibility.  During his cross-examination of the complainant, defense counsel elicited testimony that she is always truthful:

Q  . . . When you came here[ to the United States], you were on a dependent visa?

A  Yes, sir.

. . . .

Q  Were you allowed to work at that time?

A  No.

Q  And you have obtained -- and you are working here legally now, right?

A  Now, yes.

Q  And you applied for a green card, or what did you apply for?

A  I didn't apply for a green card.  But I know this was [a] visa or U visa kind of.  Not immigration, excuse me, the nonprofit organization.  But it was a U visa kind of thing.

Q  Actually, you filed to stay in the country claiming that you are a family[-]violence victim, right?  That's part of the reason you were able to file?

A  Yes.

*Q  Would you say you always tell the truth?*

*A  Yes, I do.*

*Q  And certainly under oath you wouldn't lie?*

10

*A Not to my -- no.*

Q  And as to the police, would you always tell the truth to the police?

A  Yes.  And I --

[DEFENSE COUNSEL]:  Objection, nonresponsive, Your Honor, after "yes."

THE COURT:  Overruled.  She can finish her answer.

A  I didn't tell [the] police [the] truth once when they came to Irving.

Q (BY [DEFENSE COUNSEL]) So you lied to the police in Irving?

A  Yes.  [Emphasis added.]

Appellant relied on the italicized statements regarding the complainant's truthfulness as a basis when he later attempted to admit the marriage affidavit.

### 1.  Questions about the Hindu Marriage Act

As an initial matter before proceeding to bring up the marriage affidavit, Appellant asked the complainant whether she and Appellant had gotten married under the Hindu Marriage Act, but the State made a relevance objection.  Outside the presence of the jury, defense counsel responded,

Your Honor, the evidence will show that [under that Act], they had to register their marriage and state where they lived.

And in the divorce proceeding, [the marriage affidavit] became a huge issue because . . . she testified that it was a forgery, it was not her signature.

11

And then she claimed that she [had] signed it under duress at a later hearing.

And then she changed her testimony saying, ["Y]es, that is what I signed.["]  So it goes to *credibility*, Your Honor.

*The fact that she has already testified [that] she always tells the truth.* We've got evidence to prove perjury.

And I think the jury has a right to know and weigh the *credibility* of this witness'[s] testimony as to the marriage, the events during the marriage, and the events that occurred during the divorce.  [Emphases added.]

The State responded that the Hindu Marriage Act was litigated in the divorce case and was not relevant to whether the domestic-violence incident had occurred.  The State further argued that it was "a bit of a stretch" to say that the complainant had subjected herself to perjury by saying that she always tells the truth because she openly admitted that she had lied to the Irving police.  The trial court sustained the State's relevance objection.

### 2.    Defense Exhibit 12—The Marriage Affidavit

Later during the trial, after the trial court admitted the final divorce decree, defense counsel again attempted to convince the trial court to admit the marriage affidavit:

[DEFENSE COUNSEL]:  Before you [bring the jury back in], so there is no way to convince you about getting in evidence of *credibility* with regard to her changing testimony on this document here,[9] which I will

---

[9]The document referenced is entitled "Marriage Affidavit" and is dated November 23, 2016.  It contains signatures for "Husband" and "Wife" after averring

mark as Defendant's Exhibit 12, which is the agreement she has perjured herself on at different times?

But if there is no way to change your mind, I would make an offer of proof as to Defendant's Exhibit 12.

THE COURT: I don't think I heard a Defendant's Exhibit 12. I am not familiar with Defendant's Exhibit 12.

[DEFENSE COUNSEL]: This is the document that she testified[, "]I didn't sign it[;] it's forgery.["]

And then she changed it to[, "]I signed under duress.["]

And then she changed it to[, "]Yeah, that's my signature. I signed it.["]

THE COURT: What is the document?

[DEFENSE COUNSEL]: It's the [marriage affidavit].

THE COURT: May I see it?

[DEFENSE COUNSEL]: May I approach?

THE COURT: Yes. The relevance of this document is that you have evidence of inconsistency with this witness whether she signed it or didn't sign it.

Am I saying that right? That's the relevance of this document?

[DEFENSE COUNSEL]: Yes. Statements under oath, yes.

THE COURT: Okay.

[DEFENSE COUNSEL]: She had also -- and I have marked -- I haven't gotten there.

---

that they were married under the "HINDU [M]arriage Act/Rights/Customs" and had been living together as a married couple since June 25, 2014.

With regard to her application for her dependent visa, prior to her testimony, she didn't sign it. She attached that to her application to get into the United States. But for her to say she never saw it, it goes also to *credibility*.

THE COURT: So you are offering this, the relevance is a specific prior bad act of this witness?

[DEFENSE COUNSEL]: Yes, inconsistent testimony, yes.

THE COURT: And does the State have an objection?

[PROSECUTOR]: May we have a moment, Your Honor, to look at the document? We've never seen it before.

Your Honor, I think if she -- first of all, this document has not come into evidence.

So the witness has not even been asked any questions about this, about whether or not she knows this document or what she has testified to about it.

So at this point I think it's improper to bring it in under impeachment.

Second of all, this document is not relevant as it relates to the Hindu Marriage Act, which was a whole other issue that was litigated in the family[-]law case and found to not have applied in that case.

THE COURT: I will sustain the relevance objection to this document.

[DEFENSE COUNSEL]: But to be clear, am I allowed to get -- if I do ask her if she perjured herself about the document?

THE COURT: I have already ruled on that.

My ruling is that I sustained the objection to asking this witness about whether she signed something ten years ago so that you can then impeach her that she has given inconsistent testimony about whether she signed this or the circumstances of her signing it.

14

I am sustaining the State's objection on the line of questioning that we discussed earlier. And I am sustaining the State's objection to Defense Exhibit 12.

(Admission of Defense Exhibit 12 denied)

[DEFENSE COUNSEL:] And I will make an offer of proof as to Defense Exhibit 12, Your Honor.

THE COURT: It's been offered, so it's going to be in the record.

All right. Let's bring the jury back in. [Emphases added.]

### 3. Defense Exhibit 13—The Visa Application

The final piece of impeachment evidence that Appellant attempted to admit was the complainant's visa application, which attached the marriage affidavit:

Q (BY [DEFENSE COUNSEL]) I'm going to show you what's been marked as Defendant's Exhibit 13.

When you were going to come here as a dependent on [Appellant's] work visa, did you have to sign any paperwork?

A Yes.

Q Okay. And is Defendant's Exhibit 13 a true and accurate copy of your [visa] application . . . ?

A This document was prepared by his office. I signed the document.

Q So that is your true and accurate signature on that document?

A That is correct.

Q And you signed that under oath that it was true and correct?

15

A   I didn't have the mechanism to take any oath, but I signed it. I'm sorry.

[DEFENSE COUNSEL]:     Your Honor, I would offer Defendant's Exhibit 13.

. . . .

THE COURT:   We are outside the presence of the jury.   The attorneys, approach.   I was notified -- I didn't completely look at the document, but the document, the defense just offered is Defense Exhibit 13, contains the [marriage affidavit] that I just sustained an objection to, Defense Exhibit 12.

[PROSECUTOR]:  Yes, Your Honor.

THE COURT:  You may have a seat, ma'am.

[PROSECUTOR]:   Defense Exhibit 13 appears to be her [visa] . . . application.

[DEFENSE COUNSEL]:  *I'm not offering it for impeachment.*

THE COURT:   Just offering it as something that contains the exact same exhibit that I just sustained an objection to in several pages, and that's contained in there?

[DEFENSE COUNSEL]:  That's proof of their marriage, but I'm not offering it for any other purpose.

It's contained in there proof that she was married to [Appellant] and came over[ to the United States].   I don't plan on getting into that exhibit because you excluded me from getting into that exhibit, a portion of it.

THE COURT:   Does the State object to Defense Exhibit 13? And if so, please state your objections.

[PROSECUTOR]:   Yes, Your Honor.   We would object to Defense Exhibit 13 under the same basis that we objected to Defense Exhibit 12.

16

I mean, he is certainly allowed to ask her if she applied for a visa. But that testimony has already been elicited from the victim, and we would object.

THE COURT: May I see Defense Exhibit 13?

What is the relevance of Defense Exhibit 13?

[DEFENSE COUNSEL]: Well, we believe that making these allegations changed her immigration status. This just shows more evidence that she was here as a dependent only because she was married to [Appellant].

And then this whole allegation is planned, which, apparently, for her to be independent here in the U.S. and be able to stay in case [Appellant] went back to India.

THE COURT: I will sustain the objection to Defendant's Exhibit 13. I'm not -- that's to that exhibit. You had asked her about her immigration status and any motivation there, and my ruling is not to this line of questioning, but I will sustain the objection to Defense Exhibit 13. [Emphasis added.]

### 4. Additional Argument on the Marriage Affidavit

After the trial court excluded the visa application, defense counsel reiterated his complaint about not being able to question the complainant about the marriage affidavit:

[DEFENSE COUNSEL]: Your Honor, I believe it's error to not allow somebody to put in . . . evidence of prior inconsistent testimony showing that she had perjured herself in the past.

I mean, they can waive the evidence, but certainly it should be admissible, Your Honor.

THE COURT: Are you --

17

[DEFENSE COUNSEL]: We reurge -- I can try to avoid it as much as possible.

I would like to just ask her, had she testified in the past where she had to change her testimony as evidence was presented showing she was being untruthful, something along those lines.

. . . .

THE COURT: The prior inconsistent statement that you are wanting to introduce evidence of, that statement has not been introduced at trial; is that correct?

[DEFENSE COUNSEL]: Well, you wouldn't let us introduce it at trial.

THE COURT: Well, I mean, you are not trying to show evidence of a statement that is inconsistent with something that she has testified already about in front of the jury.

Or are you wanting to introduce evidence that she made a statement that the jury hasn't heard about and that she made an inconsistent statement. Which one of those?

[DEFENSE COUNSEL]: It's the latter. But I did ask her, does she always tell the truth[,] and she said yes.

And I would like to impeach her on that testimony before this jury.

THE COURT: That request is denied.

## C. Confrontation Clause Argument Forfeited

Throughout his brief, Appellant refers to the Confrontation Clause, contending that "[i]mproper limitation of cross-examination violates the confrontation clauses of both the state and federal constitutions" and that "[t]he right guaranteed by the Confrontation Clause includes the right to cross-examine witnesses to 'attack their

18

general credibility, or to show their possible bias, self-interest, or motives in testifying.'" *See Reyes v. State*, No. 13-09-134-CR, 2010 WL 1254543, at *4 (Tex. App.—Corpus Christi–Edinburg Apr. 1, 2010, no pet.) (mem. op., not designated for publication) (citing *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009)). Appellant, however, has forfeited his Confrontation Clause arguments because he did not mention the Confrontation Clause as a basis for admission of the impeachment evidence.

The Court of Criminal Appeals has looked at an argument that evidence should have been admitted for "credibility" and determined that the appellant did not preserve a Confrontation Clause argument for appeal:

> [Appellant's] reference to "credibility" could be a reference to either the Rules of Evidence or [to] the Confrontation Clause.
>
> . . . .
>
> . . . When a defendant's objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not sufficiently specific to preserve error. . . .
>
> Although this case involves a proffer of evidence rather than an objection, the same rationale applies. [Appellant] did not argue that the Confrontation Clause demanded admission of the evidence. [Appellant's] arguments for admitting the evidence could refer to either the Rules of Evidence or [to] the Confrontation Clause. . . . Because [appellant] "did not clearly articulate" that the Confrontation Clause demanded admission of the evidence, the trial judge "never had the opportunity to rule upon" this rationale. As the losing party, [appellant] must "suffer on appeal the consequences of his insufficiently specific offer." [Appellant] did not do "everything necessary to bring to the judge's attention to the evidence rule or statute in question and its precise and proper application to the evidence in question."

*Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (footnotes and citations omitted).

Just as in *Reyna*, the record here demonstrates (1) that Appellant "did not clearly articulate" that the Confrontation Clause demanded admission of the impeachment evidence and (2) that the trial court "never had the opportunity to rule upon" this rationale. *Id.*; *see Graham v. State*, No. 06-24-00067-CR, 2024 WL 4248806, at *5 (Tex. App.—Texarkana Sept. 20, 2024, no pet.) (mem. op., not designated for publication) ("Because the record shows that [appellant] failed to argue that the Confrontation Clause demanded admission of the confidence statement, he has failed to preserve this complaint for our review."); *Brown v. State*, No. 02-23-00066-CR, 2024 WL 3712803, at *4 (Tex. App.—Fort Worth Aug. 8, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that appellant failed to preserve her Confrontation Clause argument because her argument to the trial court was that evidence of the police department's findings about a witness's dishonesty was "relevant because it [went to her] trustworthiness"); *Carter v. State*, No. 01-16-00799-CR, 2017 WL 4682187, at *2–3 (Tex. App.—Houston [1st Dist.] Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that Confrontation Clause complaint was not preserved because defendant did not refer to the Confrontation Clause as a basis for admitting exhibit or as a basis for questioning the complainant about it). Because Appellant failed to preserve his Confrontation Clause argument, he

must "suffer on appeal the consequences of his insufficiently specific offer." *See Reyna*, 168 S.W.3d at 179. Accordingly, we overrule the portion of Appellant's sole issue that raises a Confrontation Clause argument.

### D. Rule 613(a) and the Marriage Affidavit

Under the Rule 613(a) heading in his brief, Appellant states that because the complainant testified on direct examination that she and Appellant had been legally separated from the end of October to December 2014, she "opened the door for impeachment by denying that she [had] lived with [Appellant] continuously since the date of their wedding." Appellant claims that he should have been permitted to impeach the complainant with evidence of her sworn signature on the 2016 marriage affidavit attesting that they had been living together as a married couple since June 25, 2014. As detailed above, Appellant's trial counsel never referenced this testimony to the trial court. The gateway that counsel relied on was the complainant's statement that she told the truth. Appellant further argues that the complainant's testimony in the divorce proceeding "that her signature was forged, followed by her statement under oath that the signature was made under duress, before ultimately admitting that it was made voluntarily[] provides an even more substantial reason for allowing such impeachment."

Under Rule 613(a), "a party [may] impeach a witness with a prior inconsistent statement" if the "proper predicate is laid." *Ex parte Saenz*, 491 S.W.3d 819, 827 (Tex. Crim. App. 2016) (orig. proceeding). A proper predicate requires that, "[w]hen

21

examining a witness about [his] prior inconsistent statement—whether oral or written—a party must first tell the witness:  (A) the contents of the statement; (B) the time and place of the statement; and (C) the person to whom the witness made the statement."  Tex. R. Evid. 613(a)(1).  "A witness must be given the opportunity to explain or deny the prior inconsistent statement."  Tex. R. Evid. 613(a)(3).

Here, Appellant never questioned the complainant about the statement in the 2016 marriage affidavit that she had been living with Appellant as a married couple since June 25, 2014, or relied on any statement about when she and Appellant had lived together to support a theory that the marriage affidavit was admissible.  All of the information regarding whether the complainant's signature on the marriage affidavit had been forged, given under duress, etc., came solely from Appellant's counsel's oral summary of what had allegedly occurred during the divorce proceeding.  Because the plain language of Rule 613(a)(4) states that "[e]xtrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement," we cannot say that the trial court abused its discretion by excluding the marriage affidavit, especially when it is based on a theory of admissibility that the trial court never heard.  *See Graham*, 2024 WL 4248806, at *6 (holding, based on the plain language of Rule 613(a)(4), that the trial court did not abuse its discretion when it did not admit witness's statement as a prior inconsistent statement because appellant did not give the witness the opportunity to explain or deny the prior statement).

22

Also under his Rule 613(a) heading, Appellant argues that "[b]y granting the State's objection at the outset, the [trial] court did not allow [him] to even begin laying the foundation for examining [the complainant] about her prior inconsistent statements in front of the jury." Even if we assume that the trial court's ruling prohibited Appellant from fulfilling the requisites of Rule 613(a), the trial court's ruling can be upheld under Rule 608(b):

> [U]nder Rule 608, the witness's general character for truthfulness may be shown only through reputation or opinion testimony. A witness's general character for truthfulness or credibility may not be attacked by cross-examining him (or offering extrinsic evidence) concerning specific prior instances of untruthfulness. For example, the defense may not ask the witness: Didn't you cheat on your income tax last year? Didn't you lie on Tuesday about having an affair with your boss? Didn't you steal five dollars from the church collection plate last week and then lie to the priest about it? While all of those questions attack the witness's general character for truthfulness, that mode of impeachment is specifically barred by Rule 608(b). Our state evidentiary rules frown on unnecessary character assassination.

*Hammer*, 296 S.W.3d at 563 (footnotes omitted). Here, Appellant's brief claims that he wanted to use the marriage affidavit to attack the complainant's credibility generally based on a specific act of dishonesty—to show that because she had testified at trial that she had been separated from Appellant for a few months, which contradicted the marriage affidavit's statement that she had lived with Appellant as a married couple since June 25, 2014, she had perjured herself and therefore was also dishonest about the family-violence incident on February 13, 2022. This is "exactly the sort of 'instance of conduct' evidence that Rule 608(b) prohibits." *Brown*, 2024 WL 3712803,

23

at *4 (upholding trial court's decision to exclude evidence of witness's past dishonesty because it was "exactly the sort of 'instance of conduct' evidence that Rule 608(b) prohibits"); *see also Hesbrook v. State*, No. 11-15-00235-CR, 2017 WL 4440333, at *3 (Tex. App.—Eastland Sept. 29, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion by excluding evidence of the victim's previous assault allegations because the record did not reflect that appellant had any purpose for offering the allegedly prior false allegations other than to attack the victim's credibility in general). *See generally* Tex. R. Evid. 608(b) (setting forth rule prohibiting inquiry into extrinsic evidence to prove "specific instances of the witness's conduct in order to attack . . . the witness's character for truthfulness").

We overrule the portion of Appellant's sole issue challenging the exclusion of the marriage affidavit.

### E. Rule 613(b) and the Visa Application

Under the Rule 613(b) heading in his brief, Appellant contends that because "defense counsel specifically confronted [the complainant] with her motive to lie when he questioned her about claiming to be a family[-]violence victim on her visa application" and because "she denied that her claims were made for immigration purposes and claimed to always tell the truth,[10] [Appellant] was permitted to introduce

---

[10]To the extent that Appellant relies on the complainant's answer during cross-examination that she always told the truth, Appellant's reliance on that statement as creating a false impression is misplaced. As this court has previously explained in the context of a defendant's testifying in his own defense and therefore putting his

24

evidence proving that motive through specific other instances where [the complainant had] lied about her marriage for immigration purposes." Appellant's brief ignores that when he offered the visa application, he specifically told the trial court, "I'm not offering it for impeachment." When the trial court questioned why Appellant was offering the visa application as something that contained the marriage affidavit that had already been excluded, Appellant said that it was "proof of their marriage" and was not "for any other purpose."

The complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex.

character for veracity at issue, the State may correct a false impression with evidence of the relevant portions of the defendant's criminal history but only if the defendant creates the false impression on direct examination or without prompting from the State. *See Redmond v. State*, 629 S.W.3d 534, 545 (Tex. App.—Fort Worth 2021, pet. ref'd). We further expounded that "the State cannot manufacture the false impression 'by cleverly maneuvering' on cross-examination and then capitalize on its ruse by admitting evidence of the defendant's offenses." *Id.* (citations omitted). Here, Appellant manufactured during cross-examination the complainant's statement that she always testified truthfully and then endeavored to capitalize on that answer by offering a prior inconsistent statement to show that she was generally untruthful. Under *Redmond*, as well as under Rule 608(b), Appellant was not entitled to generally attack the complainant's credibility with specific instances of conduct. *See id. See generally* Tex. R. Evid. 608(b). Moreover, in response to follow-up questioning about her truthfulness, the complainant admitted that she had not always told the truth to the police; specifically, she admitted that she had lied to cover for Appellant when a neighbor had previously called the police. Thus, the jury had before it the complainant's admission that she had not always told the truth.

25

Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").

Here, Appellant's Rule 613(b) complaint on appeal does not match the basis for admitting the visa application that he argued in the trial court. *See Lovill*, 319 S.W.3d at 691–92; *McClelland v. State*, No. 14-23-00274-CR, 2024 WL 3533440, at \*2 (Tex. App.—Houston [14th Dist.] July 25, 2024, no pet.) (mem. op., not designated for publication) (holding that appellant failed to preserve appellate complaint for review when he argued on appeal that prior-conviction exhibits were admissible to show that the complainant was the first aggressor or to correct the false impression that she was peaceful after having argued at trial that the exhibits were admissible as crimes of moral turpitude). Appellant has thus forfeited any error as to the exclusion of the visa application. *See Clark*, 365 S.W.3d at 339.

Even broadly construing Appellant's statements to the trial court—that "we believe that making these [domestic-violence] allegations changed her immigration status" and that "then this whole allegation is planned . . . for her to be independent here in the U.S. and be able to stay in case [Appellant] went back to India"—it was not evidence of motive under Rule 613(b). *See generally* Tex. R. Evid. 613(b). Appellant failed to demonstrate how the complainant's 2019 visa application was relevant. Appellant relies on the premise that the complainant's initial visa application was somehow probative of a motive three years later to fabricate the claim that she was a domestic-violence victim. Allegedly, her motive to make that claim was to

26

obtain a u visa, which she did not apply for until years after she made the first visa application. If Appellant has an argument that it was the complainant's motive from the time she made her initial visa application to eventually claim that she was a domestic-violence victim, he does not explain such a stretch in his brief.

This is a stretch for many reasons, including that the complainant testified to multiple unreported assaults that had occurred before the one on February 13, 2022; that she had previously lied to cover for Appellant when a neighbor had called the police after hearing Appellant's shouting; and that it was the complainant's sister who ultimately made the 911 call triggering the case. Moreover, although the complainant admitted that after the February 2022 assault she had "filed to stay in the country claiming that [she was] a family[-]violence victim," Appellant did not attempt to introduce that visa application or put on evidence from an immigration expert to explain if visa applications from family-violence victims are automatically granted. Nor did Appellant introduce any evidence to counter the complainant's answers to repeated questioning during cross-examination that she had not discussed immigration with her sister, only divorce; that the police had directed her to a victim-advocate agency; that the agency had drafted the paperwork for her work visa; and that she "[did not] know the U.S. policies."

Furthermore, the trial court could have properly excluded the visa application (as well as the marriage affidavit) as cumulative and repetitive. *See Johnson*, 490 S.W.3d at 908 (stating that an evidentiary ruling will be upheld if it was correct on any theory

of law applicable to the case). Appellant told the trial court that the visa application "just shows *more evidence* that she was here as a dependent only because she was married to [Appellant]." Notably, the jury already had before it the complainant's and her sister's testimony that Appellant and the complainant were married, as well as the divorce decree that showed the date of their marriage, and the complainant had already admitted that she had come to the United States as a dependent on Appellant's work visa.

We overrule the remainder of Appellant's sole issue challenging the exclusion of the visa application.

## IV. Conclusion

Having overruled each of the arguments raised in Appellant's sole issue, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 5, 2024