

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00245-CR
No. 02-24-00255-CR

_____

MICHAEL EDWARD TACKITT, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court Nos. DC78-CR2022-0899, DC78-CR2024-0317

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Sexual-assault trials may raise particular evidentiary and constitutional concerns because credibility is a central, often dispositive, issue in what frequently amounts to a "he said, she said" trial, unaided by physical, scientific, or other corroborative evidence. *See Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009). During Appellant Michael Edward Tackitt's aggravated-sexual-assault-of-a-child trial (two cases involving the same complainant, Tanya[1]), the defense sought to admit into evidence certain testimony about Tanya's credibility through her mother, Helen.

Outside the jury's presence, the defense sought to admit Helen's testimony that a few months after her outcry, Tanya had lied to a friend that her brother had died despite his being "very much alive." Also outside the jury's presence, Tanya stated that she had told a peer that "[a] friend . . . that [she] thought [of] as a brother" had died and that "a lot of that got twisted" and "made it seem like [she] said something completely different." The trial court excluded Helen's testimony about Tanya's alleged misrepresentation.

At the four-day trial's conclusion, the jury found Tackitt guilty in both cases and assessed his punishment in each case at confinement for life, and the trial court

---

[1]To protect the complainant's anonymity, we use pseudonyms for her name and for the names of any witnesses related to her. *See* Tex. R. App. P. 9.10(a)(3); *see also* Tex. R. App. P. 9.8 cmt.; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. 1982).

set the sentences to run consecutively. *See* Tex. Penal Code Ann. § 22.021(a), (e); *see also id.* § 3.03(b)(2)(A) (consecutive sentences), § 12.32 (first-degree felony punishment range).

In a single point, Tackitt complains that the trial court abused its discretion by excluding the above-referenced portion of Helen's testimony. Because the trial court did not abuse its discretion, we overrule Tackitt's single point and affirm the trial court's judgments.

## II. Discussion

Tackitt contends that the excluded evidence should have been admitted because Tanya's credibility was an issue in the case, which had no corroborative physical evidence. He wanted to use the evidence to show that she had "a pattern of lying about significant important events," pointing out that her sexual-abuse outcry and the subsequent alleged untruth "were within approximately three months of each other," and relying on the Sixth Amendment's Confrontation Clause.

The State responds that evidence of Tanya's alleged lie about her brother's death was inadmissible under Rule of Evidence 608(b)[2] to attack her general

---

[2]Under Rule of Evidence 608(b), "[e]xcept for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." Tex. R. Evid. 608(b). In *Hammer*, the Court of Criminal Appeals gave the following examples barred by Rule 608(b) in attacking specific prior instances of a witness's untruthfulness, stating,

3

credibility and truth-telling character; that Tackitt failed to satisfy the two predicates required under Rule 613(b)[3] to admit evidence of her motive for testifying when it did not reoffer Helen's excluded testimony after Tanya testified; and that under the relevant case law, Tackitt did not show a causal link or logical relationship between Tanya's alleged lie about her brother and her alleged motive to make a sexual-abuse allegation against Tackitt.

We will review the applicable law and then present the excluded evidence within the context of the trial's other evidence.

## A. Standard of review and applicable law

We review a trial court's decision on the admissibility of evidence for an abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial

---

[T]he defense may not ask the witness: Didn't you cheat on your income tax last year? Didn't you lie on Tuesday about having an affair with your boss? Didn't you steal five dollars from the church collection plate last week and then lie to the priest about it? While all of those questions attack the witness's general character for truthfulness, that mode of impeachment is specifically barred by Rule 608(b).

296 S.W.3d at 563.

[3]If Rule 613(b)'s requirements are followed, a witness may be cross-examined on specific instances of conduct to establish his or her specific bias, self-interest, or motive for testifying. *Hammer*, 296 S.W.3d at 563. Under Rule 613(b), the opponent must first cross-examine the witness with the circumstances surrounding the bias, interest, or motive, and, if the witness denies the circumstances or the motive, the opponent may introduce extrinsic evidence to prove the motive or bias. *Id.* Extrinsic evidence of a witness's bias or interest is not admissible unless the witness is first examined about the bias or interest and fails to unequivocally admit it. Tex. R. Evid. 613(b)(4).

4

court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for the ruling. *Id.*

An argument that evidence should have been admitted because it was offered to attack the complainant's credibility may involve both the Confrontation Clause and the Rules of Evidence. *Id.* at 909. The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to reveal their possible bias, self-interest, or motive in testifying as it may relate directly to issues in the case at hand. *Hammer*, 296 S.W.3d at 561–62 (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974)). The state evidentiary rules also permit a defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition, but they nonetheless "frown on unnecessary character assassination." *Id.* at 563.

Only if the proffered evidence is barred by all state evidentiary rules must courts turn to the federal constitution. *Id.* at 566. And "[o]nly when the trial court's limitation on cross-examination sweeps so broadly as to render the examination wholly ineffective can it be said that the trial court commits an error of constitutional dimension." *Johnson v. State (Thaxton)*, 433 S.W.3d 546, 557 (Tex. Crim. App. 2014). That is, the federal constitution is offended if a state evidentiary rule "would prohibit [the defendant] from cross-examining a witness concerning possible motives, bias,

and prejudice to such an extent that he could not present a vital defensive theory." *Hammer*, 296 S.W.3d at 562–63.[4]  But a trial court may otherwise limit the scope and extent of cross-examination so long as those limits do not operate to infringe upon the Confrontation Clause's guarantee of an opportunity for effective cross-examination. *Johnson*, 490 S.W.3d at 909.

The trial court may impose such reasonable limits because an accused is not entitled to cross-examination that is effective in whatever way and to whatever extent he or she might wish.  *Thaxton*, 433 S.W.3d at 551–52.  For example, when a defendant seeks to impeach a witness with evidence of pending criminal actions, the trial court has discretion to place limits on those areas of cross-examination in which the defendant fails to establish some causal connection or logical relationship between

---

[4]In *Hammer*, the Court of Criminal Appeals held that it was an abuse of discretion to exclude proffered defensive evidence showing the complainant's motive to falsely accuse the defendant of molesting her.  296 S.W.3d at 557–58.  The defense's theory was that the complainant had lied about sexual abuse by the defendant (her father) because he was strict and because making the false accusation would return him to prison.  *Id.* at 566.  The trial court had excluded evidence that the complainant had been particularly angry with her father when he took her to the hospital for a sexual-assault examination after she ran away from home and stayed out overnight and had excluded her statements in her sexual-assault exam's records and to others that showed that she "was not above changing her story of a consensual sexual encounter with her boyfriend to a nonconsensual one with someone else to prevent her father from learning the truth and presumably punishing her for running away and having sex with [her boyfriend]."  *Id.* at 567, 569.  The court noted, "This evidence, relating to events occurring shortly before the two alleged sexual encounters at issue in this trial and relevant to [the complainant's] animus toward [the defendant] and her desire to get out of his house, is demonstrably more probative than prejudicial in establishing her motive to testify."  *Id.* at 569.

6

the pending charges and the "vulnerable relationship" alleged between the witness and the State. *Id.* at 552. This is a question of relevance. *See id.* ("[A] defendant who cannot persuasively establish this connection has essentially failed to demonstrate that the evidence he seeks to introduce (i.e., the existence and/or severity of the pending charges) is *relevant* to prove the allegation of bias.").[5] To be considered relevant, the proffered evidence need not definitively prove the bias alleged but rather need only make the existence of bias more probable or less probable than it would be without the evidence. *Id.*; *see* Tex. R. Evid. 401 (defining "relevant" evidence).

Further, even if the defendant satisfactorily establishes relevance through showing a "logical connection" between the proffered impeachment evidence and the bias allegation, the trial court's discretion does not simply terminate upon that showing because merely establishing the relevance of proffered evidence does not

---

[5]In *Thaxton*, a capital-murder case, the defendant complained on appeal that the trial court had violated his right under the Confrontation Clause to effectively cross-examine adverse witnesses when it restricted his cross-examination of two witnesses for bias by allowing him to expose only the fact that they stood accused of "certain unspecified 'felonies,'" but not the specific felony charges and punishment ranges. 433 S.W.3d at 548. The court concluded that no abuse of discretion occurred when the trial court allowed the defendant not only to allege the potential for bias by asking each witness whether he expected his testimony to be of any benefit to him but also to substantiate the criminal allegations by asking each witness whether he had any charges pending in the county and by asking each whether those charges were for misdemeanors or felonies to show that the potential for bias was weightier than it might otherwise have been. *Id.* at 556. Thus, the defendant was permitted to make a record from which to argue, in a manner consistent with the logical connection he posited at trial and on appeal, that the witnesses' vulnerable relationships with the State may have colored their testimonies. *Id.*

necessarily guarantee its admissibility. *Thaxton*, 433 S.W.3d at 555. The trial court exceeds its discretion only when it "so drastically curtail[s] the defendant's cross-examination as to leave him 'unable to make a record from which to argue why the witness might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial.'" *Id.* (quoting *Davis*, 415 U.S. at 318, 94 S. Ct. at 1111).

The considerations, then, are (1) whether there is relevance through a logical connection; (2) whether the trial court has entirely foreclosed even the possibility of cross-examination into a prototypical form of bias; and (3) whether a reasonable jury might have received a significantly different impression of the witness's credibility if defense counsel had been permitted to pursue the proposed line of cross-examination. *Id.* "[A] 'less than optimal' opportunity for cross-examination does not, of itself, violate the Sixth Amendment." *Id.* at 557; *see also Hill v. State*, No. 02-16-00106-CR, 2017 WL 1953329, at *1, *7 (Tex. App.—Fort Worth May 11, 2017, pet. ref'd) (mem. op., not designated for publication) (applying *Johnson*, 490 S.W.3d at 908, and *Hammer*, 296 S.W.3d at 562, to conclude that exclusion of specific instances of complainants' conduct in continuous-sexual-abuse-of-a-child trial "prevented the jury from having a clear picture that [the] behavioral issues were sexual in nature and, thus, were directly probative and relevant to [the] defensive theory that [one of the complainants] would make up sexual allegations to get herself out of trouble for her own sexual indiscretions," particularly when some of the excluded evidence showed that one of

them had been suspended from school for sexual misbehavior before she made her outcry).

Reasonable restrictions on cross-examination may be based on such criteria as harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant. *Johnson*, 490 S.W.3d at 910.

During the instant case's trial, defense counsel referred the trial court to *Johnson*, an aggravated-sexual-assault-of-a-child case. *See id.* at 897. In *Johnson*, the defendant claimed that the trial court had abused its discretion and violated his right of confrontation by excluding a proffered cross-examination about the complainant's past sexual behavior because it was relevant to his defense of fabrication that the complainant had outcried to garner sympathy and to deflect negative attention away from himself. *Id.* at 908. The complainant had sexually molested his younger sister for years and, as a result, his parents had placed him into counseling at around the same time that he had made his sexual-abuse outcry about the defendant. *Id.*

During cross-examination before the jury, the *Johnson* complainant admitted that when he did not get a promised gaming system from the defendant, he knew he "could make an accusation of sexual abuse and get somebody in trouble." *Id.* at 902. Outside the jury's presence, he testified that he had been sexually abusing his sister for several years and that when he was put into counseling before November 2007, his parents had not known about the defendant's sexual abuse of him but had known about his sexual abuse of his sister. *Id.* at 903–04. Defense counsel offered the

9

evidence as relevant to the complainant's emotional state at the time of his November 2007 outcry and his motive for accusing the defendant as not only to deceive but also to get attention, and he made the proffer under the Sixth Amendment, Rule 404(b),[6] and Rule 412[7] regarding credibility and motive to fabricate. *Id.* at 904.

The Court of Criminal Appeals held that the evidence should have been admitted because "[i]n a case such as this, where the believability of the complainant forms the foundation of the State's case, Texas law favors the admissibility of evidence that is relevant to the complainant's bias, motive, or interest to testify in a particular fashion." *Id.* at 910. The record did not show that the trial court had excluded the complainant's past-sexual-behavior evidence because it had concerns about harassment, prejudice, confusion of the issues, witness safety, or repetitive interrogation, and nothing in the record would have supported such a finding. *Id.* at 911. And the evidence that the complainant had been sexually molesting his sister and that his parents had placed him in counseling because of it was "clearly relevant to the issue of whether [he] had a motive to falsely accuse [the appellant] of sexual

---

[6]"'Rule 404(b) explicitly permits the defense . . . to offer evidence of other acts of misconduct to establish a person's motive for performing some act—such as making a false allegation against the defendant." *Hammer*, 296 S.W.3d at 563.

[7]Rule 412, which does not apply here, generally prohibits the admission of reputation or opinion evidence or specific instances of a victim's past sexual behavior in a prosecution for sexual assault, aggravated sexual assault, or attempt to commit sexual assault or aggravated sexual assault, with some exceptions for the admissibility of specific instances, including evidence that "relates to the victim's motive or bias" and evidence that "is constitutionally required to be admitted." *See* Tex. R. Evid. 412.

assault." *Id.* The court concluded that the evidence was admissible under Rule 412 because it related to the complainant's motive to fabricate the accusation and that it was constitutionally required to be admitted under the Confrontation Clause. *Id.* at 913.

## B. Evidence

### 1. Outcry witness

On May 3, 2022, when Tanya was in sixth grade, she told Rebecca McAnally, her school counselor, that Tackitt had started inappropriately touching her when she was six years old and had kept doing so until 2021, culminating with his having digitally penetrated her vagina more than once. McAnally testified as the outcry witness. *See* Tex. Code Crim. Proc. Ann. art. 38.072.

McAnally described Tanya as a self-conscious girl, who was "especially nervous" when she made her outcry. That day, Tanya had "the urgency of I've got to get this off my chest. I've got to tell someone something that's going on that's bad to me." During cross-examination, McAnally described Tanya as "very much a teacher pleaser[,] wanting to do what is right all the time" and no more dramatic than any other sixth grade student. She stated that Tanya had visited her office that year "more than five [times,] no more than ten though."

Tanya had recounted to McAnally not only the elements of the charged offenses but also how Tackitt's abuse had begun by his "rub[bing] his bare belly" on her back at family swim parties; his making inappropriate comments about how her

breasts had grown; and his frequent, unwanted communications after he obtained her cell phone number. Tanya also told McAnally that Tackitt would become upset when she failed to answer his messages or calls and that, at one point, he had told her that "she was like a drug to him, and whenever he couldn't have access to her, couldn't see her via Facetime, or text or call or whatever, that he would go through withdrawals." And Tanya told McAnally that her mother almost found out at a football game in 2021 because "her friend told her cousin who told her aunt who told [Tanya's] mother about a creepy [relative]."

**2. Police testimony, Tackitt's interview, and Tackitt's cell phone**

Detective Jeff Lee agreed that there was no medical evidence, DNA, eyewitnesses, or other physical evidence of the offenses. He was assigned to the case two days after Tanya's outcry to McAnally. By that time, Tanya had already undergone a forensic interview, which was recorded, and he had viewed the recording and had forensically downloaded the contents of Tanya's cell phone. On May 19, he interviewed Tackitt at the police station and received Tackitt's consent to search his cell phone. The interview, which had been recorded, was published to the jury.

During his police interview, Tackitt described his relationship with Tanya as "fantastic" and explained that he had babysat her during the summer when Helen was at work. When asked about an allegation that he had touched Tanya's "butt," Tackitt answered that it "was three, four years ago," that he "d[id]n't even remember it," that

it had happened while "swimming or wrestling," and that it "was absolutely nothing" and "just an innocent thing" of which her mother had not made a big deal.

When asked about other allegations, Tackitt generally denied everything and asked, "[W]here's this coming from?" and "This is [Tanya] saying that?" But when asked if he recalled telling Tanya that she was like a drug to him and asking her if she knew how drug addicts act when they do not have their drug, he admitted saying something like that to her. He also made statements like, "This is innocent, so innocent" and asked whether he should "lawyer up over this." He admitted to having spent "[t]housands of dollars o[n] clothing" for Tanya.

When Detective Lee asked for consent to search his phone, Tackitt replied, "I don't have any problem with it, but let me ask you something. What if you misread something in there?" He then again asked if he needed a lawyer but also told the detective that he had nothing to hide. He also asked Detective Lee, "What do you think all this [is] about? . . . Why is she saying these things?" and stated that "[t]here's nothing inappropriate that's happened," but that what he feared most was that there might be "something that might be turned into something that looked like it was inappropriate."

When Detective Lee returned Tackitt's phone to him a few minutes later, Tackitt asked him, "What's motivating all this?" Tackitt then volunteered, "You don't think it's over money, something stupid like this. [Because] I cut [Helen] off." He also complained that it seemed like someone was coaching Tanya to make the

13

allegations. And when Detective Lee asked if there was anything that he knew of that was going on with Tanya in the last few years that might cause her to make the allegations, Tackitt stated, "I hear that she throws whoppers out there," i.e., that Tanya was a liar. When the detective then asked him if Tanya lied a lot, Tackitt replied, "Evidently." But when asked if she had ever lied to him, Tackitt said that she had "a few times," but that her lies to him were not "big ones" that would worry him.

Detective Jason Jones completed the forensic download on Tackitt's phone. During Detective Jones's testimony, exhibits from the phone—photos, videos, text messages, and FaceTime calls—were admitted into evidence without objection. Of the 200 FaceTime calls between Tackitt's phone and Tanya's phone, 192 were from Tackitt to Tanya, from all times of the day and evening. There were also hundreds of text messages on the phone.

### 3. Tanya's mother

Helen, Tanya's thirty-five-year-old mother, testified that Tanya suffered from optic nerve hypoplasia and nystagmus, which caused her eyes to roll. Before marrying Tanya's stepfather in March 2021, Helen had been a single working mother, relying on her family for child care and financial help. Helen stated that Tackitt had provided her with money for a year to a year and a half but that he had cautioned her that he was running out of money; she initially testified that he told her this at the end of 2019 or in 2020, around two years before Tanya's outcry. Helen was recalled the next day and clarified that Tackitt had stopped giving them money in 2021 and that he told

14

her in April 2022, a month before Tanya's outcry, that he could not give them any more money.

Around two years before the outcry, Helen had learned about Tackitt's having allegedly touched Tanya's "rear end." She spoke with him about it and then "didn't think anything of it." She had initially thought Tanya's May 2022 outcry had been in reference to that incident, which she had heard about again during a football game in 2021, six months before McAnally called her about the sexual-abuse outcry. When asked about it on recall, Helen stated that after her sister-in-law called about Tanya's speaking to her cousin and one of their close friends, she "let anger get the best of" her instead of reaching out to Tanya and asking her what happened. She denied having called Tanya a liar but rather having stated, "I hope you're not lying about this."

On redirect, she read to the jury a text that she had sent to Tackitt on September 29, 2021—the week after the football game:

> I spoke to [Tanya's Telehealth] counselor today. I told her that everything's been bothering [Tanya]. I told her that it was addressed three years ago and told her what happened. She was starting -- she was starting to get in the chair with you, and you just had your hand to stabilize her from falling. I told her you would even be willing to talk to them if it came down to that. She said that she will talk to [Tanya] and get to the bottom of everything and work on it from there.

The issue was not raised in the second counseling session, and there were no additional sessions with that counselor. Helen testified that she had invited Tackitt to participate in the counseling session to clarify anything that had been misconstrued.

15

Outside the jury's presence during the first day of Helen's testimony, Tackitt's counsel made several offers of proof as to what was going on in Tanya's life around the time of the outcry and about other abuse-related allegations Tanya had made. The State raised no objections to the first three proffers, and Helen testified before the jury that

- In April and May 2022, Tanya had complained to her about being bullied and body-shamed at school because of her eye condition and weight gain.

- Helen had known that Tanya had visited McAnally's office but did not know that it was up to ten times that year.

- When Tanya's father and stepmother divorced in February 2021, Tanya told Helen that her stepmother had physically abused her.

The remaining offer of proof is the one at issue here. In the following colloquy, defense counsel asked about Tanya's alleged lie:

> Q The last thing I want -- I guess the last thing I wanted to talk to you about was did [Tanya] ever come to you and say she was bullied in [the other] school?
>
> A She did, yes, and it -- . . . .
>
> . . . .
>
> and it came about with the lying again there. She went and made up a lie, and it was addressed to her dad that was then told to me that she said that her brother died.
>
> Q Okay. And did she post that somewhere on social media?
>
> A She did not. She was talking to one of her friends and then it domino affected [sic] and went to the parent and then went back to [Tanya's] dad.

16

Q Okay.  Was her brother dead?

A No.  He was very much alive.

Defense counsel offered that testimony under the Sixth Amendment, referencing *Johnson* as "a much broader inquiry about the credibility of a witness." The prosecutor objected under Rule 608(b), and the trial court sustained the objection.

After defense counsel made an additional proffer that if Tanya's father were called, he "would testify likewise" that Tanya "told a lie regarding her brother['s] . . . dying and that that was a lie."  When the prosecutor raised the same objection as before, defense counsel elaborated on the proffer, stating, "[W]hat I'm offering it for is there's a -- I believe this child is seeking attention and that's why she made the outcry, and so the lying about her brother dying I think she's seeking attention, and I think it could come in for that limited purpose."  The prosecutor pointed out that in *Johnson*, "there was already an allegation of some kind of sexual activity"—the complainant's molesting his younger sister—and the trial court noted that "most of the cases involving 608(b) appear to create an exception . . . for previous allegations of sexual abuse," instead of a specific instance of a lie about the child's brother after the outcry.

Defense counsel reiterated, "This is just my defensive theory in this case that she is making the outcry for attention, seeking attention, and that's consistent with

other evidence that she went to the counselor five, ten times[,] consistent with her being bullied, consistent with her behavior afterwards." The trial court excluded the evidence.

### 4. Tanya

Tanya was fourteen years old when she testified at trial. She recounted several instances of Tackitt's "uncomfortable" touching and actions, including when he touched her rear end when she was almost six years old. In that instance, she had been sitting on the edge of a chair "and [she] was kind of laid across his lap, and he had started to pull [her] pants down and slowly touch [her] butt." When she told her mother about it a week later, her mother contacted him, he lied, and her mother "believed him." When asked why she continued to FaceTime and text with Tackitt, she stated that she "knew no one was going to believe [her] that he was doing these things to [her], might as well treat him like the family he was, and try to forget about the things that he was doing."

Tanya stated that Tackitt digitally penetrated her for the first time when she was nine, that it felt "very, very uncomfortable," and that her body froze. After that he did it "almost every single day." He told her not to tell anyone because he could go to prison if anyone found out. He also told her that she was like a drug to him.

Tanya said that she did not tell her mother what was happening but stated, "[T]here was a time when she found out that I was saying stuff about it, and she came into my room, woke me up and started yelling, saying that I was lying and that I

18

needed to stop saying these things that weren't true." During cross-examination, Tanya testified that on that occasion, she had told a girl who told Tanya's cousin, who told Tanya's aunt, who then told Tanya's mother, and that after a football game, her mother had woken her and yelled at her.

Tanya agreed that she had been bullied most of her sixth-grade year and that she had visited McAnally's office several times that year—more than five times but less than ten. She denied liking drama or wanting attention and agreed that she had told her mother about the bullying and that her mother had believed her and had called the school several times. When asked, "So the only thing you're saying your mother didn't believe you was about repeated sexual abuse allegations?" Tanya replied, "Yes, sir. She said that she knew that he would never do anything like that."

Outside the jury's presence, defense counsel took Tanya's testimony as part of an offer of proof:

> Q . . . Did you make a statement to some people that your brother had died?
>
> A Yes.
>
> Q Who were the people?
>
> A I don't remember exactly.
>
> Q Kids or adults?
>
> A Yeah, kids.
>
> Q And were the kids at school or --

19

A Yes.

Q All right.  And was that true?

A A friend had passed, yes, that I thought [of] as a brother.

Q Okay.  So you weren't really talking about your brother?

A No.  And a lot of that got twisted.

Q So who was the person that died?

A It was one of my -- I met him through another friend.  We talked a lot and then he ended up killing himself.

Q What was his name?

A His name was [Karl].

Q So you weren't really meaning one of your brothers.  You were meaning some kid you met that summer and he died shortly thereafter?

A Yes, sir.

Q Did you get in trouble by your dad or anything like that?

A Yes, I did.

Q Well, if you were just talking about some random kid, why did you get in trouble?

A Because the people I had told had completely twisted what I had said, made it seem like I said something completely different and ran to him about it.

The prosecutor objected to this testimony under Rules 608(b) and 404, and the trial court sustained the objection.

**5. Expert**

20

The State called an expert from the National Forensic Interviewing Network. The expert, who had not been provided with the case's facts, testified that it would be "incredibly damaging" for a child to outcry to a parent and not be believed and that "over 90 percent of the time" children are sexually abused by someone they know and trust. She also described the "grooming" process, which could include a perpetrator's consistently providing money to the child's family.

### 6. Defense witness

Tackitt's sister called into question the dates during which Tackitt had access to Tanya and testified that Tanya's reputation for truthfulness was bad.

## C. Analysis

Regarding the evidence's relevance and the "causal connection" requirement, the outcry's timing, in part, controls the evidence's admissibility. *See Johnson*, 490 S.W.3d at 912. The record here reflects that at the time of her outcry (unlike the complainant in *Johnson*), Tanya had no bias or motive to falsely accuse Tackitt of sexually abusing her. To the contrary, McAnally testified that Tanya was a nervous, self-conscious, "teacher-pleaser" student, and other testimony showed that she had been bullied because of her physical differences (eyes and weight). Additionally, both Tanya and Helen testified about Helen's negative reactions to Tanya's earlier complaints about Tackitt. Unlike in *Johnson*, *Hammer*, or *Hill*, there was no allegation of sexual misconduct *by* Tanya before her outcry for which her outcry might serve to deflect otherwise negative attention and attract sympathy, and there was no

21

connection between her sexual-abuse outcry and the subsequent alleged lie about her brother's death, making the evidence—at best—only marginally relevant to the trial's sole issue about whether Tackitt had sexually abused her. *Cf. id.*; *Hammer*, 296 S.W.3d at 569; *Hill*, 2017 WL 1953329, at *7.

Further, Tackitt was not prevented from presenting his defensive theory that Tanya was lying about sexual abuse for attention. His counsel asked McAnally, the school counselor, if Tanya was dramatic, and during Tackitt's police interview, which was published to the jury, Tackitt told the detective that it seemed like someone was coaching Tanya to make those allegations, alluded to Helen's being financially cut off by him, and impugned Tanya's credibility by stating, "I hear that she throws whoppers out there" and by claiming that she had lied to him a few times.

As set out above, the excluded evidence was not admissible to challenge Tanya's general credibility or relevant to show her alleged motive to make a false sexual-abuse claim against Tackitt, and Tackitt was able to sufficiently present his defensive theory challenging Tanya's credibility. Accordingly, because the record reflects that the trial court did not abuse its discretion by excluding the evidence, we overrule Tackitt's sole point.

### III.  Conclusion

Having overruled Tackitt's sole point, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 31, 2025